# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1535

_____

United States of America,           *
                                    *
          Appellee,                 *
                                    *   Appeal from the United States
     v.                             *   District Court for the
                                    *   District of Minnesota.
Eugene Arthur Blaylock,             *
                                    *
          Appellant.                *

_____

Submitted:  December 13, 2004
Filed:  August 31, 2005

_____

Before ARNOLD, BEAM, and RILEY, Circuit Judges.

_____

RILEY, Circuit Judge.

     Eugene Arthur Blaylock (Blaylock) appeals his conviction.  In a superceding indictment, the government charged Blaylock with three counts: conspiracy to distribute methamphetamine and ecstasy (Count I), aiding and abetting possession with intent to distribute methamphetamine (Count V), and aiding and abetting possession with intent to distribute ecstasy (Count VI).  A jury acquitted Blaylock of Counts I and VI, but found Blaylock guilty of Count V for 50 or more grams of actual

methamphetamine. The district court[1] sentenced Blaylock to 120 months' imprisonment and five years' supervised release. Blaylock assigns numerous errors, including (1) the district court's denial of his pretrial severance and suppression motions; (2) the denial of a fair trial due to the prosecutor's peremptory challenge of a prospective juror based on sexual orientation; (3) the denial of his right to call witnesses on his behalf; (4) the improper admission at trial of his previously suppressed statement to police; (5) insufficiency of evidence to support his conviction; and (6) the cumulative effect of pretrial and trial errors, which prejudiced his right to a fair trial. Finding no reversible errors, we affirm.

## I.     BACKGROUND

### A.     Factual Summary

Originally from Texas, Blaylock lived in Dallas when he first met co-defendants Jason Haslip (Haslip) and Timothy Ehrmann (Ehrmann) at a fund raiser in Austin on Memorial Day weekend in 2001. After their initial meeting, Blaylock saw Haslip and Ehrmann at various fund raisers and circuit parties[2] in July and September 2001. At these events, Blaylock, Haslip, and Ehrmann engaged in recreational drug use, sharing personal quantities of ecstasy, ketamine, and methamphetamine. In between events Blaylock kept in touch via e-mail and telephone with Haslip and Ehrmann, who lived in Minneapolis.

In late April 2002, Ehrmann telephoned Blaylock and told him he was planning to vacation in Arizona and would try to stop in Dallas on his return trip to Minneapolis. On May 10, Ehrmann sent Blaylock an e-mail message stating, "I apologize for not getting those samples down to you." The e-mail message informed Blaylock that Ehrmann might travel to Dallas on the weekend of May 19 and stay a

---

[1]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota.

[2] Circuit parties are a series of gay dance parties held around the world.

few days. The same e-mail message ended stating, "If that happens, and you choose to meet up, I will bring them with me."

On May 18, Blaylock sent Ehrmann an e-mail message stating, "I went to the white party this past weekend, and I am here to tell you, demand is high and supply is low right now. Prime time to establish a working relationship is upon us." On June 1, Ehrmann called Blaylock from Arizona, telling Blaylock he would be driving back to Minneapolis and, if feasible, would stop in Dallas. Ehrmann invited Blaylock to accompany him to Minneapolis via Chicago, where Ehrmann would show Blaylock a couple of the clubs. Ehrmann explained to Blaylock that he would stay in Minneapolis for a week to ten days, and then Ehrmann would fly Blaylock back to Dallas.

Ehrmann arrived in Dallas with co-defendant Jimmie Orr (Orr) on Sunday, June 2. They met Blaylock in a parking lot, where Blaylock left his vehicle and joined Ehrmann and Orr. Later that evening, the three checked into a club, where they spent the night. On the same evening, Blaylock ingested some ecstasy supplied by Ehrmann. The following day, instead of driving north, the three drove west to Phoenix. Once they arrived in Phoenix, Orr retrieved his bags from the car and disappeared.

Ehrmann and Blaylock spent five days in Phoenix and Scottsdale. Blaylock vacationed, while Ehrmann worked on locating Orr. On three or four occasions during his layover in Phoenix, Blaylock used methamphetamine supplied by Ehrmann. Blaylock saw a "small baggie, kind of puffy, full of white crystal meth," which he characterized as being a personal use amount. On June 5, Blaylock agreed to cash two large checks for Ehrmann. The first check was made out to "Butch Eugene Blaylock" in the amount of $4,000 and was dated June 4, 2002. Blaylock cashed the check and delivered the proceeds to Ehrmann. Several hours later, Blaylock cashed a second check made payable to him in the amount of $3,500 and

-3-

gave the proceeds to Ehrmann. After several days in Phoenix, Ehrmann located Orr, who decided to return to Minnesota in a separate vehicle. Ehrmann and Blaylock made plans to drive from Phoenix to Minneapolis with a brief stop in Chicago.

On June 8, Ehrmann and Blaylock left Phoenix in a car rented by Ehrmann and headed for Chicago. Blaylock was driving on Interstate 40, when Arizona State Trooper Anthony Gerard (Trooper Gerard) clocked the vehicle traveling at ninety-four miles per hour, nineteen miles per hour over the maximum speed limit. After stopping the vehicle, Blaylock gave Trooper Gerard his Texas driver's license and the car rental agreement signed by Ehrmann. Blaylock complied with Trooper Gerard's requests to exit the vehicle and walk back to the patrol car. Trooper Gerard asked Blaylock his purpose in traveling to Arizona, and Blaylock replied that he and Ehrmann had gone to Phoenix "to hang out." Blaylock also told Trooper Gerard he was unemployed. Trooper Gerard issued Blaylock a speeding ticket, returned his documents, and advised him he was free to go.

While Blaylock was walking back to the rental vehicle, Trooper Gerard asked Blaylock if he would answer a few more questions. Blaylock agreed and returned to the patrol car. Trooper Gerard told Blaylock there was a problem with drugs being transported along the interstate, and asked Blaylock whether any illegal drugs were inside the car. When Blaylock answered in the negative, Trooper Gerard asked Blaylock for permission to search the vehicle, and, after briefly pausing, Blaylock consented. Blaylock returned to the rental vehicle to retrieve the keys from the ignition. After conversing briefly with Ehrmann, Blaylock told Trooper Gerard that Ehrmann did not want Trooper Gerard to search the car, and advised Trooper Gerard he would need to speak with Ehrmann. To secure his personal safety, Trooper Gerard directed Blaylock to stay by the driver's door.

Trooper Gerard then approached the passenger side of the rental vehicle and spoke with Ehrmann, who told Trooper Gerard he was in a hurry and did not want

-4-

Trooper Gerard to search the car. When Trooper Gerard assured Ehrmann it would only take five minutes to search the car, Ehrmann changed the basis of his objection and told Trooper Gerard a search would invade his privacy. As Ehrmann was voicing his objections, Trooper Gerard observed Ehrmann flipping his seat belt back and forth and noticed Ehrmann's hands were shaking. Trooper Gerard then asked Ehrmann whether any illegal drugs were in the car, at which point Ehrmann's right eyebrow began quivering uncontrollably and his right arm started shaking.

Suspecting criminal activity was afoot, Trooper Gerard called a canine unit, which arrived at the scene approximately seventeen minutes later. A drug-sniffing dog alerted to the vehicle's trunk. When Trooper Gerard searched the trunk, he recovered a large black duffle bag with two packages containing approximately a pound of a white crystal substance that field tested positive for methamphetamine, and also found ten ecstasy tablets, a digital scale, and $520 inside a smaller black duffle bag. Following the search, Blaylock and Ehrmann were arrested.

Immediately upon being arrested, Blaylock told a detective he should talk with a lawyer, but then agreed to proceed with an interview. During the interview, Blaylock admitted "he knew all, everything that was going on." Blaylock told the detective he knew Ehrmann was coming to Phoenix to buy a "high amount" of methamphetamine. Blaylock also told the detective the trip to Chicago had been delayed two or three days because "things were not falling into place." Blaylock explained to the detective he was traveling with Ehrmann because Blaylock was contemplating the idea of selling drugs, and he was using his vacation with Ehrmann to see if Ehrmann could set him up and see where the business would go.

## B.    Procedural History

A grand jury indicted Blaylock and five other co-defendants on federal drug trafficking charges. Blaylock pled not guilty and proceeded to trial along with four of the other co-defendants. Before trial, Blaylock moved to suppress the evidence

obtained during the vehicle search and his post-arrest statements.  The district court adopted the magistrate judge's recommendations and denied the motion to suppress the fruits of the vehicle search, but granted the motion to suppress Blaylock's post-arrest statements, which had been obtained in violation of the Sixth Amendment.

Trial lasted three weeks and included testimony from thirty witnesses and the admission of more than 100 exhibits.  Co-defendant Orr pled guilty and agreed to testify as a cooperating government witness.  Orr testified Ehrmann purchased a pound of methamphetamine in Phoenix, and Orr saw the pound of methamphetamine in the sitting area of the hotel room Ehrmann shared with Blaylock.  Orr testified Blaylock was asleep in the room while Orr and Ehrmann discussed the methamphetamine transaction.  Orr also testified Ehrmann told him that Ehrmann intended to help out Blaylock financially through some future transactions in Ohio, Chicago, and Minneapolis, and Blaylock would help Ehrmann get rid of some drugs. On cross-examination, Orr admitted he had never told any law enforcement officers about this alleged joint venture between Ehrmann and Blaylock, but had told only the prosecutor.

After the government rested, Blaylock waived his Fifth Amendment rights and testified.  Blaylock denied being part of a drug conspiracy and denied aiding and abetting possession of methamphetamine or ecstasy with the intent to distribute. Blaylock testified that, when Ehrmann and Orr arrived in Dallas, Blaylock expected the three would be traveling to Minneapolis via Chicago.  The next day, Blaylock testified, the plan changed, and they instead drove west toward Phoenix for Ehrmann to retrieve some money from Orr's aunt's house.  Although Blaylock admitted he used methamphetamine during his five-day layover in Phoenix, Blaylock testified he did not use any other drugs, and he never saw any ecstasy tablets or the large quantity of methamphetamine, which were discovered during the car search.  Blaylock testified the only drugs he saw during the trip were small personal use amounts of

methamphetamine. Blaylock also denied owning the large duffle bag, which he claimed belonged to Ehrmann.

Blaylock testified that gradually, over the course of several days in Phoenix, Ehrmann's access to drugs, the large amounts of cash, and frequent cellular phone calls between Orr and Ehrmann combined to make Blaylock "more and more aware . . . that something was going on." Blaylock acknowledged that he began thinking something–a drug deal–was going down between Ehrmann and Orr by the third or fourth day in Phoenix. Blaylock told the jury he had not been involved in dealing drugs in Arizona, nor had he had any direct conversations with Orr or Ehrmann about what was happening. Blaylock also told the jury, before he and Ehrmann set off on June 8, Blaylock specifically asked Ehrmann if he had any more drugs on him, and Ehrmann told Blaylock he did not.

On cross-examination, Blaylock testified ketamine was his drug of choice and further testified his e-mail message to Ehrmann stating, "You and I have seriously got to get together ASAP. I went to the white party this weekend. And I'm here to tell you demand is high and supply is low," referenced a possible future business relationship with Ehrmann, from whom Blaylock wanted to purchase ketamine, which he intended to sell for profit. The prosecutor then impeached Blaylock with his post-arrest interview statements, and Blaylock reluctantly admitted he had never uttered the word "ketamine" during the police interview, nor had he used ketamine during his June trip. The prosecutor also attempted to impeach Blaylock on his ecstasy use. However, Blaylock explained to the jury that, while he had used ecstasy on June 2 when he, Ehrmann, and Orr spent the evening in Dallas, he did not use any ecstasy in Arizona, and he understood Ehrmann did not have any ecstacy.

The prosecutor next sought to impeach Blaylock by using his post-arrest statements. Blaylock admitted he told police in a post-arrest interview that Ehrmann told Blaylock they were traveling to Arizona from Dallas to purchase a large quantity

of methamphetamine.  Blaylock also admitted that, throughout the trip from Dallas to Arizona, he knew there was methamphetamine and ecstasy around him.  Blaylock also admitted he told the Arizona detective he knew what was going on around him, and was using the Arizona-to-Minneapolis trip to see if Ehrmann could set him up selling drugs.

The jury returned a special verdict, acquitting Blaylock of the conspiracy charge (Count I) as well as the charge of aiding and abetting possession with intent to distribute ecstasy (Count V).  However, the jury found Blaylock guilty of aiding and abetting possession with intent to distribute methamphetamine (Count VI).  The district court sentenced Blaylock to a mandatory minimum term of 120 months' imprisonment and five years' supervised release.

Blaylock raises numerous errors on appeal.  He contends (1) the district court erred in denying his pretrial motions to sever and to suppress the fruits of the vehicle search; (2) the district court made numerous trial errors, including denying his Batson challenge, allowing co-defendant Ehrmann to be excused from testifying, and admitting suppressed evidence; (3) the evidence at trial was insufficient for a jury to convict him of aiding and abetting possession with intent to distribute methamphetamine; and (4) the cumulative effect of these pretrial and trial errors denied him the right to a fair trial.

## II.    DISCUSSION
### A.    Pretrial Motions
#### 1.    Severance Motion
Generally, defendants who are "charged in a conspiracy should be tried together, particularly where proof of the charges against the defendants is based upon the same evidence and acts." United States v. Boyd, 610 F.2d 521, 525 (8th Cir. 1979).  Because defendants who are jointly indicted on similar evidence from the same or related events should, in most instances, be tried together, a defendant

seeking severance must show "real prejudice," that is, "something more than the mere fact that he would have had a better chance for acquittal had he been tried separately." United States v. Oakie, 12 F.3d 1436, 1441 (8th Cir. 1993) (citing United States v. Adkins, 842 F.2d 210, 211-12 (8th Cir. 1988)).

Rule 14(a) of the Federal Rules of Criminal Procedure allows a district court to grant a severance of defendants if it appears a defendant or the government is prejudiced by a joinder. See Fed. R. Crim. P. 14(a). The United States Supreme Court has declared the joinder and severance rules "are designed to promote economy and efficiency and to avoid a multiplicity of trials, so long as these objectives can be achieved without substantial prejudice to the right of the defendants to a fair trial." Zafiro v. United States, 506 U.S. 534, 540 (1993) (internal quotations omitted). We review under an abuse of discretion standard a district court's denial of a motion to sever. United States v. Mickelson, 378 F.3d 810, 817 (8th Cir. 2004).

The district court was not required to grant severance simply because Blaylock claimed he needed a separate trial in order to call co-defendant Ehrmann as a witness. Rather, Blaylock needed to establish the likelihood Ehrmann actually would have testified and his testimony would have been exculpatory. Id. at 818; United States v. Delpit, 94 F.3d 1134, 1143-44 (8th Cir. 1996). The record establishes that, when Blaylock filed his pretrial motion for severance, he never represented to the district court Ehrmann would be willing to testify on Blaylock's behalf. Nor is the record sufficiently clear Ehrmann's testimony, if adduced, would have been exculpatory. Although Ehrmann told an Arizona detective on September 11, 2002, Blaylock "never saw [the drugs] directly," Ehrmann also made multiple inculpatory statements: (1) Ehrmann and Blaylock "had talked about getting together and buying meth"; (2) "Blaylock used meth during their trip"; and (3) "Blaylock should've known what was happening."

At trial, Blaylock renewed his motion for severance, claiming Ehrmann was willing to testify. Then on August 5, 2003, Blaylock's counsel discovered Ehrmann was not willing to testify. The next day, Ehrmann's counsel informed the district court Ehrmann was contemplating testifying to information related exclusively to Blaylock's case, but defense counsel acknowledged "the problem, obviously, for Mr. Ehrmann is . . . [the prosecutor] would then feel compelled to go into the free talk that occurred down in Arizona." Ehrmann's counsel then offered Ehrmann's testimony if Ehrmann were allowed to answer only questions asked by Blaylock's counsel or by Ehrmann's own counsel. When the district court properly ruled Ehrmann would be subject to the government's cross-examination if he took the stand, Ehrmann's counsel advised the district court Ehrmann was inclined to invoke his Fifth Amendment rights. Absent a firm representation Ehrmann would be willing to testify on Blaylock's behalf, the district court did not abuse its discretion in denying the motion to sever.

The record on appeal establishes (1) Blaylock's "mere presence" defense was not incompatible with the defenses of his co-defendants; and (2) the jury was able to compartmentalize the trial evidence as it related to each of the co-defendants. The jury actually acquitted Blaylock of two of three indicted offenses, which persuades us the jury proved itself quite capable of compartmentalizing the evidence. We find no abuse of discretion in the district court's denial of Blaylock's motion to sever.

## 2. Suppression Motion

Blaylock next contends the district court erred in denying his motion to suppress evidence obtained during an illegal search and seizure. We review de novo the district court's conclusions of law and review for clear error the district court's factual findings. See United States v. Welerford, 356 F.3d 932, 935 (8th Cir. 2004). We will affirm the district court's order denying Blaylock's motion to suppress the fruits of the vehicle search, "unless the decision is unsupported by substantial evidence, is based on an erroneous view of the applicable law, or in light of the entire

-10-

record, we are left with a firm and definite conviction that a mistake has been made." United States v. Barry, 394 F.3d 1070, 1074 (8th Cir. 2005) (quoting Welerford, 356 F.3d at 935).

Traffic stops constitute "seizures" within the meaning of the Fourth Amendment, see United States v. Martinez, 358 F.3d 1005, 1009 (8th Cir. 2004), and must be reasonable under the principles enunciated in Terry v. Ohio, 392 U.S. 1 (1968). Generally, a traffic "stop must be supported by at least a reasonable, articulable suspicion that criminal activity" has occurred or is occurring. United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001). A traffic violation, no matter how minor, creates probable cause for a law enforcement officer to stop the vehicle. See United States v. Barry, 98 F.3d 373, 376 (8th Cir. 1996). In performing a traffic stop, an officer may conduct investigatory procedures reasonably related in scope to the circumstances that initially justified the interference. United States v. McCoy, 200 F.3d 582, 584 (8th Cir. 2000) (per curiam). The officer may detain a motorist while the officer performs routine tasks, such as writing a citation and completing computerized checks of a driver's license, vehicle registration, and criminal history. United States v. $404,905.00 in U.S. Currency, 182 F.3d 643, 647 (8th Cir. 1999).

However, "once the officer decides to let a routine traffic offender depart with a ticket, a warning or an all clear–a point in time determined, like other Fourth Amendment inquiries, by objective indicia of the officer's intent–then the Fourth Amendment applies to limit any subsequent detention or search." Id. at 648. We declared previously that an officer cannot continue to detain a motorist after the officer completes the initial stop, unless the officer has "a reasonably articulable suspicion for believing" criminal activity is afoot. United States v. Beck, 140 F.3d 1129, 1134 (8th Cir. 1998); see also United States v. Fuse, 391 F.3d 924, 927-28 (8th Cir. 2004); Jones, 269 F.3d at 925 (explaining "with the purpose of the traffic stop completed, it would be an unreasonable extension of the scope of the investigation for [the trooper] to further detain [the suspect] or his vehicle, 'unless something that

-11-

occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention'") (quoting United States v. Mesa, 62 F.3d 159, 162 (6th Cir. 1995)).

In this case, the traffic stop facts are straightforward. Trooper Gerard clocked the rental vehicle traveling nineteen miles per hour over the maximum speed limit. Trooper Gerard had probable cause to stop the vehicle for speeding. United States v. Winters, 221 F.3d 1039, 1041 (8th Cir. 2000). Blaylock argues, once Trooper Gerard issued Blaylock a speeding citation and told him he was free to go, Trooper Gerard no longer had reasonable suspicion to delay the vehicle or detain its occupants. We do not agree with Blaylock's contention that he was illegally detained following the initial traffic stop. When Trooper Gerard asked Blaylock if he would be willing to answer some additional questions, Blaylock replied affirmatively, and willingly walked back to the patrol car. When Trooper Gerard asked permission to search the vehicle, Blaylock paused momentarily before consenting to the search. When Blaylock returned to the car to retrieve the car keys and Ehrmann objected to the search, Blaylock told Trooper Gerard he would need to speak to Ehrmann. Trooper Gerard then directed Blaylock to stay by the driver's car door while Trooper Gerard spoke to Ehrmann. Blaylock acquiesced, and stood by patiently while Trooper Gerard spoke with Ehrmann. Up to this point, no unlawful detention had occurred.

Recently, in United States v. Fuse, 391 F.3d 924, 929 (8th Cir. 2004), we ruled "the termination of a traffic stop does not effectively erase the objectively reasonable suspicions developed by a police officer during the traffic stop." Our review of the suppression record convinces us Trooper Gerard had developed objectively reasonable suspicions before he asked Blaylock, and later Ehrmann, for consent to search the vehicle. When Trooper Gerard first approached the vehicle, he testified he thought it strange Ehrmann did not look up from his computer and make eye contact with him. Trooper Gerard also found it odd that Blaylock said he was driving

from Dallas to Phoenix with no specific purpose, other than "to hang out." Trooper Gerard further testified he found it unusual that Blaylock would be vacationing when he was unemployed. Trooper Gerard's initial suspicions increased when Blaylock consented to a search, but Ehrmann then refused consent. Upon approaching Ehrmann, Trooper Gerard testified Ehrmann appeared nervous, and was fidgeting and squirming in his seat. Ehrmann also changed his rationale for objecting to the search. First Ehrmann told Trooper Gerard he was in a hurry and could not wait for the vehicle search. After Trooper Gerard assured him a search would take only five minutes, Ehrmann told Trooper Gerard he did not want his privacy invaded. Trooper Gerard noticed Ehrmann's hands were shaking. When Trooper Gerard pointedly asked Ehrmann whether illegal drugs were in the vehicle, Ehrmann's eyebrow began twitching uncontrollably and his right arm began shaking.

Blaylock's statements and actions throughout the traffic stop, when viewed in a vacuum, would not have given Trooper Gerard a reasonable, articulable suspicion to detain the vehicle. However, Blaylock's passenger, Ehrmann, exhibited suspicious behavior throughout the traffic stop. Ehrmann's suspicious actions, which included nervous squirming, twitching, and shaking, combined with Blaylock's vague reasons for making the trip to Arizona and their presence on a known drug corridor in a rental car provided Trooper Gerard with reasonable suspicion to detain the vehicle until a canine unit arrived. See id. at 929-30. Once the canine alerted to the trunk, Trooper Gerard had probable cause to search the vehicle. Under these facts, we conclude the district court did not err in denying Blaylock's motion to suppress the fruits of the lawful search.

### B. Alleged Trial Errors
#### 1. Batson Challenge
Blaylock raises a challenge under Batson v. Kentucky, 476 U.S. 79 (1986), to the government's peremptory strike of a panel member, contending the government struck the panel member because of his sexual orientation. The district court denied

the Batson challenge, first questioning Batson's application to sexual orientation challenges, and then finding Blaylock failed to make a prima facie showing of unlawful discrimination and the government offered legitimate, nondiscriminatory reasons for exercising a peremptory challenge against the panel member. Blaylock attempts to elevate this challenge to the level of a constitutional error under the Batson line of cases, arguing the denial of his Batson objection denied him the right to a fair trial.

Under Batson, a party opposing a peremptory strike may make a prima facie case of discrimination by showing the circumstances support an inference that the exercise of the challenged peremptory strike was based on unlawful discrimination. United States v. Velazquez-Rivera, 366 F.3d 661, 665 (8th Cir. 2004). If the objecting party establishes a prima facie case, then the proponent of the peremptory strike must provide a nondiscriminatory explanation for the strike. Id. The district court then must determine whether there was purposeful discrimination. See Elmahdi v. Marriott Hotel Servs., Inc., 339 F.3d 645, 651 (8th Cir. 2003); Hall v. Luebbers, 341 F.3d 706, 713 (8th Cir. 2003). We review the district court's Batson ruling for clear error, United States v. Jones, 245 F.3d 990, 992 (8th Cir. 2001), and we accord great deference to the district court's findings, United States v. Roebke, 333 F.3d 911, 912 (8th Cir. 2003). See Batson, 476 U.S. at 98 n.21 (reasoning because the district court's findings largely turn on credibility, we give those findings "great deference"); Elmahdi, 339 F.3d at 651. Although the California Supreme Court has held sexual orientation should be a protected class for jury selection purposes, see People v. Garcia, 92 Cal. Rptr. 2d 339, 347-48 (2000), and the Ninth Circuit has assumed, without deciding, sexual orientation qualifies as a Batson classification, Johnson v. Campbell, 92 F.3d 951, 953 (9th Cir. 1996), neither the Supreme Court nor this circuit has so held.

While we doubt Batson and its progeny extend constitutional protection to the sexual orientations of venire persons, our review of the trial record persuades us that

even if Blaylock made a prima facie case of purposeful discrimination, his <u>Batson</u> objection fails, because the government offered legitimate nondiscriminatory reasons for striking the panel member. The prosecutor told the district court that he questioned the suitability of this panel member before learning of the panel member's sexual orientation. Specifically, the prosecutor explained to the court he was concerned by the panel member's liberal education and his musician background, and the prosecutor felt the panel member was a potential loner. Blaylock offered no evidence to show the prosecutor's proffered reasons were pretextual. Accordingly, we find no clear error.

### 2.     Right to Call Witness

Blaylock claims the most fatal trial error occurred when the trial court allowed Ehrmann to be excused from testifying. Blaylock intended to call Ehrmann as a defense witness and subpoenaed him. After considering the matter, Ehrmann invoked the Fifth Amendment and declined to testify at trial. Blaylock never called Ehrmann as a witness or moved the district court to compel Ehrmann to testify.

We review for an abuse of discretion a district court's decision not to compel testimony after a witness has claimed a Fifth Amendment privilege. <u>United States v. Washington</u>, 318 F.3d 845, 856 (8th Cir. 2003). Blaylock's challenge represents a conflict between his right to call Ehrmann as a witness in his defense and Ehrmann's right to avoid self-incrimination. "It is well settled that an accused's right to compulsory process must yield to a witness's Fifth Amendment privilege not to give testimony that would tend to incriminate him or her." <u>United States v. Habhab</u>, 132 F.3d 410, 416 (8th Cir. 1997).

"The Self-Incrimination Clause of the Fifth Amendment guarantees that no person 'shall be compelled in any criminal case to be a witness against himself.'" <u>Withrow v. Williams</u>, 507 U.S. 680, 688 (1993) (quoting U.S. Const. amend. V). "Nothing in the Fifth Amendment, or in any other constitutional provision, provides

a means for overcoming this privilege once a potential witness has invoked it." United States v. Moussaoui, 382 F.3d 453, 466 (4th Cir. 2003). Blaylock's Sixth Amendment right to compulsory process does not include the right to compel Ehrmann or any other witness to waive his or her Fifth Amendment privilege against self-incrimination. United States v. Bowling, 239 F.3d 973, 976 (8th Cir. 2001); United States v. Robaina, 39 F.3d 858, 862 (8th Cir. 1994) (citing Kastigar v. United States, 406 U.S. 441, 444 (1972)).

Ehrmann did not want to subject himself to the government's cross-examination. He did not want to divulge his inculpatory post-arrest statements. Ehrmann's right to preserve his Fifth Amendment privilege against self-incrimination trumped Blaylock's right to compel him to testify. Accordingly, we find no error.

### 3.    Admission of Suppressed Evidence

Blaylock next assigns as error the admission of his post-arrest statements during the government's cross-examination of him at trial. We review a district court's evidentiary ruling concerning the admission of suppressed statements for impeachment purposes under an abuse of discretion standard. United States v. Pierson, 101 F.3d 545, 546 (8th Cir. 1996). Before trial, Blaylock moved to suppress post-arrest statements he made to an Arizona detective, arguing that after he asserted his desire to consult with legal counsel, the government violated his Sixth Amendment right to counsel by eliciting uncounseled statements without first obtaining from Blaylock an express, voluntary waiver of his rights. The magistrate judge made a recommendation, which the district court adopted, to suppress the statements from use during the government's case-in-chief. However, the government was not precluded from using Blaylock's post-arrest statements to impeach Blaylock, testing the truthfulness of his story, in the event Blaylock testified inconsistently at trial. Harris v. New York, 401 U.S. 222, 225-26 (1971) (declaring defendant who testifies falsely may be impeached with suppressed statements).

Blaylock first contends his post-arrest statements were involuntary and therefore could not be used to impeach him. However, Blaylock never moved to suppress his interview statements based on a Fourth Amendment voluntariness violation; therefore, Blaylock waived this argument on appeal. Instead, Blaylock moved to suppress his interview statements based on a Sixth Amendment denial of his right to counsel. The magistrate judge ruled "it is less than clear from the evidence in the record whether Blaylock did in fact request an attorney at the scene of his arrest." However, giving Blaylock the benefit of the doubt, the magistrate judge concluded Blaylock had requested an attorney prior to the interview. Because the police detective "reinitiated communication with Blaylock, . . . asking both routine questions and incriminatory questions, [and] asked Blaylock to waive his previously-invoked right to counsel," the detective's "conduct invalidated any subsequent waiver," and the magistrate judge concluded Blaylock's statements should be suppressed. The district court adopted the recommendation and suppressed the interview statements.

Before trial, the government filed a motion in limine, seeking to use Blaylock's interview statements for impeachment. Before Blaylock testified, his counsel advised Blaylock his prior statements to the Arizona Highway Patrol could be used against him if Blaylock testified inconsistently to any of the prior statements. The district court also declared Blaylock could be impeached with his prior statements. Given these express admonitions, we agree with the government, Blaylock's prior statements were admissible as impeachment evidence.

Blaylock claims the prosecutor engaged in improper impeachment, contending his prior interview statements were consistent with his trial testimony. We have ruled previously, "inconsistency [of prior statements] is not limited to diametrically opposed answers but may be found in evasive answers, inability to recall, silence, or changes of position." United States v. Dennis, 625 F.2d 782, 795 (8th Cir. 1980). The government contends Blaylock changed his position between the time Blaylock

-17-

gave a post-arrest interview and when he testified at trial. Our record review establishes Blaylock's "gradual epiphany" trial defense was arguably inconsistent with some admissions Blaylock made during his post-arrest interview. On direct examination, Blaylock testified he understood the purpose of the return trip from Dallas to Phoenix was for Ehrmann to collect money from Orr's aunt's house. However, during his June 8 post-arrest interview, Blaylock told the police detective he "was aware of things that were going on" and knew Ehrmann was coming to Phoenix to buy a "high amount" of methamphetamine. Notably, Blaylock did not tell the detective during his interview he *now* knew why Ehrmann had traveled to Phoenix; instead, he told Arizona police, "we drove and I mean I knew all, everything that was going on." Although Blaylock's post-arrest statements do not reveal exactly when Blaylock learned of Ehrmann's and Orr's purpose for returning to Phoenix, the context and syntax of Blaylock's interview admissions strongly imply Blaylock knew of the trip's illegal purpose at a much earlier time than he testified to the jury.

Blaylock also objects to the prosecutor impeaching Blaylock regarding his ecstasy use. Blaylock testified at trial he used ecstasy on June 2, but did not use ecstasy again during the trip. Blaylock also claimed ketamine was his preferred drug and the drug he was interested in selling for profit. During his post-arrest interview, Blaylock told the officer he and Ehrmann did not use any ecstasy, and Blaylock was under the impression Ehrmann did not possess any ecstasy. While Blaylock's post-arrest statement is not diametrically opposed to his trial testimony, his post-arrest statement can be inferred as being a general denial of using ecstasy, which is inconsistent with Blaylock's trial testimony. Blaylock had a full and fair opportunity to reconcile the statements and to explain that he used ecstasy in Dallas on June 2, and not during the time he was in Arizona. Any impeachment error was harmless.

Blaylock further objects to the prosecutor's impeachment on the subject of ketamine. We conclude the prosecutor's impeachment of Blaylock on this subject was permissible. On direct examination, Blaylock portrayed himself as purely a

-18-

recreational drug user and only a prospective dealer of ketamine, a controlled substance not named in the superceding indictment. When Blaylock deliberately chose to distance himself from the indicted controlled substances of ecstasy and methamphetamine, the prosecutor was entitled to ask Blaylock whether he had ever discussed or mentioned ketamine in his post-arrest interview. When Blaylock answered that he thought he had, the prosecutor asked Blaylock to locate the word "ketamine" in the post-arrest interview transcript, which Blaylock could not do, because Blaylock had never uttered the word "ketamine" to the Arizona police.

In taking the witness stand, Blaylock assumed tremendous risks, of which he was fully forewarned. In portraying himself to the jury as a recreational drug user and prospective dealer of ketamine, and in testifying he was in the dark about the trip's purpose until just before leaving Phoenix, Blaylock set himself up for the prosecutor to impeach him on these fundamental credibility issues. While the district court arguably may have erred in allowing impeachment on the subject of Blaylock's ecstasy use, we conclude any error was harmless, because Blaylock had an opportunity to explain the consistency of his statements. See United States v. Brack, 747 F.2d 1142, 1152 (7th Cir. 1984). Indeed, Blaylock's explanation of his ecstasy use likely secured him an acquittal on Count VI.

### C.    Sufficiency of Evidence

Blaylock also contends the evidence at trial was insufficient to convict him of aiding and abetting possession of methamphetamine with intent to distribute. We review de novo the sufficiency of the evidence, examining the evidence in the light most favorable to the jury verdict and giving the verdict the benefit of all reasonable inferences. United States v. Sheikh, 367 F.3d 756, 763 (8th Cir. 2004). We will not disturb a verdict, unless no reasonable jury could have found Blaylock guilty beyond a reasonable doubt on each element of the charge. Id.

Blaylock argues no reasonable jury could have convicted him of aiding and abetting possession with intent to distribute methamphetamine while acquitting him of a conspiracy to do the same. The conspiracy and the aiding and abetting counts, however, are not identical. Count I charged Blaylock, Ehrmann and four other defendants with conspiring to distribute more than 500 grams of methamphetamine and ecstasy; whereas, Count V charged only Ehrmann and Blaylock with aiding and abetting possession with intent to distribute approximately 250 grams of methamphetamine. Thus, these two counts differed not only as to the defendants indicted, but also as to the types and quantities of controlled substances alleged.

Section 2(a) of Title 18 of the United States Code declares whoever aids or abets the commission of a crime is punishable as a principal. 18 U.S.C. § 2(a). The jury was instructed that, in order to find Blaylock guilty of the crime of aiding and abetting possession of methamphetamine with intent to distribute, it must find beyond a reasonable doubt Blaylock associated himself with the unlawful venture, he participated in the unlawful venture as something he wished to bring about, and he sought by his action to make the unlawful venture succeed. United States v. LaGuardia, 774 F.2d 317, 319 (8th Cir. 1985). The unlawful venture charged was possession of methamphetamine with the intent to distribute.

The jury did an exceptional job of compartmentalizing the evidence of each charge against each of the five defendants. With the exception of a couple incriminating e-mail messages in May 2002, the government's inculpatory evidence against Blaylock consisted of his conduct between June 2, when he joined Ehrmann and Orr in Dallas, and June 8, when he was arrested outside Flagstaff. The government presented evidence that during this period Blaylock (1) admitted to the Arizona detective the purpose of the return trip to Phoenix was to purchase a distributable quantity of methamphetamine; (2) admitted he was taking the vacation with Ehrmann for the purpose of having Ehrmann set him up dealing illegal drugs; (3) assisted in the purchase of the methamphetamine by cashing two checks and

tendering the proceeds to Ehrmann, who then purchased the methamphetamine with the check proceeds; and (4) assisted Ehrmann in driving the vehicle. Sufficient evidence existed for a reasonable jury to find beyond a reasonable doubt Blaylock aided and abetted possession of methamphetamine with intent to distribute.

On the other hand, the jury had no evidence before it tying Blaylock to any of the conspiratorial transactions involving large quantities of methamphetamine and ecstasy, which occurred in Minnesota, Nevada, and California. Apparently, the jury believed Blaylock when he testified he had no knowledge Ehrmann possessed any ecstasy. Because the government had no evidence linking Blaylock to the small quantity of ecstasy recovered, the jury acquitted him of Count VI. Concluding the jury performed its duties well, we will not disturb its verdict.

### D.     Cumulative Error

Blaylock's fifth and final assigned error asserts the cumulative effect of all previous claimed errors denied him his Sixth Amendment right to a fair trial. Our review of the record convinces us Blaylock received a fair trial.

### E.     Sentencing

The district court sentenced Blaylock to 120 months' imprisonment, the mandatory minimum sentence for aiding and abetting possession of 50 grams or more of methamphetamine with intent to distribute. 21 U.S.C. § 841(b)(1)(A)(viii). Because Blaylock's sentence is not based upon the United States Sentencing Guidelines, but is imposed by the governing criminal statute upon a drug quantity finding of fifty or more grams of methamphetamine as determined by a jury beyond a reasonable doubt, Blaylock is not entitled to resentencing under the holding in United States v. Booker, 125 S. Ct. 738 (2005). We affirm his sentence. See United States v. Vieth, 397 F.3d 615, 620 (8th Cir. 2005).

## III.  CONCLUSION

Accordingly, we affirm Blaylock's conviction and sentence.

_____