# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-4083

_____

United States of America,

        Appellee,

v.

Susan Wintermute,

        Appellant.

_____

No. 05-2433

_____

Appeals from the United States
District Court for the
Western District of Missouri.

United States of America,

        Appellee,

v.

Clarence Stevens,

        Appellant.

_____

Submitted: November 17, 2005
Filed:  April 11, 2006 (Corrected May 26, 2006)

_____

Before ARNOLD, BEAM, and RILEY, Circuit Judges.

_____

RILEY, Circuit Judge.

Susan Wintermute (Wintermute) appeals her convictions for conspiracy to make a false statement to the United States in violation of 18 U.S.C. § 371 and making a false statement to the Office of the Comptroller of the Currency (OCC) in violation of 18 U.S.C. § 1001, arguing the district court erred by (1) excluding her expert witness's testimony, and (2) declining to hold an evidentiary hearing regarding her allegations of tainted jury deliberations. Wintermute's co-defendant, Clarence Stevens (Stevens), appeals his conviction for conspiracy to defraud the United States, arguing insufficient evidence supported his conviction. Stevens also appeals his sentence based on numerous grounds. We affirm Wintermute's and Stevens's convictions, but remand for resentencing of Stevens.

## I.    BACKGROUND

In 1994, in Springfield, Missouri, Wintermute and her now deceased ex-husband Damian Sinclair (Sinclair) co-founded a consumer finance company called Sinclair Financial Group (SFG). SFG raised capital by selling time certificates or fixed rate investments to private investors and small investment firms in Missouri, and used the generated funds to buy installment loan contracts, including less profitable manufactured housing loans. Wintermute served as general counsel and director. During the same time, Sinclair also formed Sinclair Management Services (SMS), which he wholly owned. SMS serviced the discount retail installment contracts SFG purchased. Wintermute served as an officer and director of SMS, and later became vice president. Wintermute and Sinclair were paid salaries by both SFG and SMS.

In July 1997, Sinclair hired Stevens, a certified public accountant, as Chief Financial Officer of SFG; one month later Stevens became its president. Sinclair later hired Scott Pope (Pope) as an attorney for SFG. Pope eventually became SFG's corporate secretary and general counsel.

Sinclair desired an institution to provide a consistent source of funds for SFG. He sought a bank and finance company that could work together. Realizing there would be conflicts of interest if he had a stake in both such a bank and his finance company, Sinclair sold SFG to Stevens. On July 13, 1999, Sinclair, Wintermute, and Stevens signed a Purchase and Sale Agreement (P&S Agreement). It declared Wintermute and Sinclair would sell SFG to Stevens for $9.5 million: $5 million in SFG cash and $4.5 million in consumer loan installment contracts from SFG. The sale closed on October 16, 1999, and a closing memorandum included changes to the P&S Agreement, showing a new purchase price of $14.5 million: $5 million cash from SFG, $3.7 million in manufactured home loans, forgiveness of an $800,000 mortgage debt of Sinclair and Wintermute, and a $5 million unsecured personal note from Stevens to Sinclair and Wintermute. The closing memorandum stated SMS was not being sold along with SFG and amounts owed to SFG by SMS were not affected by the sale. This included a $1.1 million loan from SFG to SMS, which in turn was loaned to Sinclair, Wintermute, and others, to finance collection efforts and to pay for the Sinclair Bank and Trust charter. Stevens changed the name of SFG to Stevens Financial Group (StFG); however, SFG and StFG were used interchangeably in the business. Pope served as general counsel, secretary, and a director of StFG.

In July 1999, Sinclair and Wintermute applied to purchase Texline State Bank. In the application, Sinclair and Wintermute listed their employment with SFG, but omitted any affiliation with SMS. Pope prepared the application under Sinclair's direction, and was told to omit reference to SMS because it was being shut down. Sinclair and Wintermute signed the application, but Sinclair eventually withdrew it.

On January 3, 2000, DD&F Consulting Group (DD&F) filed an Application for Change in Control (Application) with the OCC on behalf of Sinclair and Wintermute to acquire Northwest National Bank (NNB). NNB had significant problems and was operating under a memorandum of understanding at the time. Sinclair and Stevens had met with Brenda McNeese (McNeese), senior corporate analyst with the OCC, in December 1999. Sinclair disclosed to McNeese the sale of SFG to Stevens and

discussed his proposal to use NNB to buy loans in bulk from SFG and other entities. When McNeese asked Sinclair about his ownership interests, Sinclair named some farms, but not SMS. Stevens did not correct Sinclair.

The Application contained an Interagency Biographical and Financial Report (IBF Report) signed on December 8, 1999, by Sinclair and Wintermute, which Pope had completed, in part, based on the information included in the application to purchase Texline State Bank. Pope again was directed to omit reference to SMS and the $5 million personal note from Stevens to Sinclair and Wintermute, with the explanation there was no decision of how to dispose of the debt from SMS to SFG, and the note from Stevens would show conflicting ties to an entity Sinclair wanted to do business with after acquiring NNB.

Pope gave the Application to Wintermute to review and sign. Wintermute later signed the IBF Report in Pope's presence, certifying "the information contained in the biographical report and/or financial report has been carefully examined by me and is true, correct, and complete." The IBF Report omitted (1) Sinclair's and Wintermute's employment with SMS for the previous five years, (2) Sinclair's association as owner and director of SMS, (3) Wintermute's association as officer and director of SMS, (4) SMS owing StFG more than $5 million, and (5) Stevens's $5 million debt to Sinclair and Wintermute.

McNeese sent questions to Sinclair about the Application, including inquiries regarding the sale of SFG. On January 31, 2000, DD&F responded, stating the total consideration for the sale was $9.5 million in cash and $4.5 million in receivables that SFG serviced. Sinclair indicated the manufactured housing loans he and Wintermute owned would not be sold to the bank. The response letter revealed the existence and Sinclair's sole ownership of SMS, and explained SMS serviced and collected retail installment contracts and mortgage loans originated and purchased by SFG.

McNeese testified at trial that because Sinclair omitted required information on the IBF Report including employment with SMS and SMS notes receivable, she believed SMS had been sold to Stevens along with SFG, and StFG serviced the loans Sinclair received when he sold SFG. McNeese further testified the SFG-SMS relationship was significant because the bank was going to be doing business with SFG, and all transactions needed to be at arm's length with full disclosure, with no conflicts of interest. McNeese added even if there were to be no transactions between SMS and the bank, the information was still important to the OCC.

The OCC approved the Application on February 29, 2000, and Sinclair National Bank (SNB) began operating as a federally insured bank on March 7, 2000. Sinclair and Wintermute paid $2.75 million and injected $2 million in capital into SNB. SNB's administrative headquarters were in SFG's building in Springfield, Missouri. Sinclair was chairman, Wintermute was vice chairperson, and both were directors.

SNB immediately began purchasing sub-prime loans from SFG. On March 21, 2000, the board, including Wintermute and Sinclair, ratified the purchase of $2 million in automobile retail installment contracts from SFG, and authorized the future purchase, on a monthly basis, of $2 million in automobile retail contracts and $500,000 in manufactured home contracts. Three of the manufactured home contracts sold by SFG to SNB on April 3 had been sold to SFG by Wintermute just days earlier; four more loans sold to SNB by SFG similarly had been sold by Wintermute after the OCC approved the Application. SFG accountant Lonnie Pederson (Pederson) testified (and check requests corroborated) Stevens instructed him to pick loans worth $100,000 out of Wintermute's portfolio and sell them to SFG, then turn around and sell them to SNB. Wintermute never advised SNB's board her loans were being sold to SNB. Between March 2000 and March 2001, SFG sold SNB a total of $15,724,242 in loans; in mid-2000, $5 million in loans were sold back to SFG to avoid a lending limit violation.

On May 1, 2000, in response to the OCC's inquiries about Sinclair's relationship with SFG, Sinclair filed a statement of interest, declaring he was SMS's sole owner, which was a "non-operating shell." On May 5, 2000, the OCC received an audited financial statement of SFG as of December 31, 1999. In the financial statement, the actual $14.5 million sale price of SFG was revealed to the OCC for the first time. It also revealed that the leveraged buyout was financed by taking $5 million cash out of SFG and by Stevens executing a $5 million personal note to Sinclair and Wintermute, and that SMS owed SFB $5.3 million, including $4.8 million in advances.

The financial statement raised questions with the OCC about non-disclosed related interests on the Application. On May 18, 2000, the OCC asked Sinclair for further disclosure of the relationships among Sinclair, SNB, StFG, SMS, and other related entities. Sinclair responded on June 16, 2000, indicating the $5 million personal note from Stevens to Sinclair and Wintermute was an offset to SMS's $5 million indebtedness to SFG. Sinclair also disclosed SMS had been sold to Spartan Finance Company (Spartan), Spartan assumed the SMS obligation to StFG, and the $5 million note was transferred to Spartan. Sinclair indicated he and Wintermute would be consultants to StFG for no cash compensation through July 13, 2001. These disclosures prompted more OCC questions, specifically about SMS's debt to SFG. The OCC noted SMS's debt was corporate debt, but the $5 million promissory note Stevens executed to Sinclair and Wintermute was personal debt, despite the fact the debts were different amounts, and debts among different parties cannot be offset.

The OCC continued to inquire about the relationship between SFG and SMS, and on August 4, 2000, Sinclair produced key documents to the OCC. These included the July 13, 1999, P&S Agreement showing a selling price of $9.5 million; the October 16, 1999, closing memorandum; the $5 million personal note from Stevens; and the $5.34 million unsecured promissory note from SMS to StFG. The OCC continued to find safety and soundness issues, and ordered an investigation in late 2000. The OCC discovered StFG was paying Sinclair "consulting expenses" of

$43,500 per month and that StFG loaned Wintermute $962,223 on April 3, 2000, to purchase a home in Springfield, Missouri. Stevens signed the check from StFG to the land title company to pay for the home. StFG funded the sale by selling bulk auto loans to SNB, and Wintermute reconveyed back to StFG a portion of her manufactured home contracts in full payment of the note.

By February 2001, SNB's financial condition had deteriorated. The OCC presented an examination report to SNB's board, including Sinclair and Wintermute. The report discussed possible breaches of fiduciary duty. Subsequent attempts to achieve compliance failed. Wintermute resigned on May 31, 2001, and the bank was closed in September 2001.

Wintermute, Sinclair, and Stevens were charged in a nine-count superseding indictment on November 20, 2003. A jury found Wintermute and Stevens guilty of Count One (conspiracy to make a false statement to the United States) and found Wintermute guilty of Count Two (making a false statement). The jury acquitted Wintermute on charges of illegal participation, misapplication, and two counts of bank fraud, and acquitted Stevens on charges of bank fraud and misapplication. The district court sentenced Wintermute to two years' probation and a fine of $5,000. Stevens was sentenced to 60 months' imprisonment and ordered to pay restitution to the FDIC in the amount of $4,206,425. This appeal followed.

## II.  DISCUSSION

Wintermute appeals two evidentiary rulings by the district court. Stevens appeals arguing there was insufficient evidence to convict, and his sentence was in error for numerous reasons. We address Wintermute's arguments first.

### A.  Exclusion of Expert Testimony

Wintermute argues the district court erred in denying the testimony of Paul Schott (Schott), former chief counsel for the OCC from 1987 to 1991. Wintermute's alleged crime of making a false statement to the OCC in violation of 18 U.S.C. § 1001

required the government to prove, *inter alia*, Wintermute's false statement in the IBF Report was material, or capable of influencing the OCC's decision to grant Wintermute and Sinclair's application to acquire NNB. See United States v. Johnson, 937 F.2d 392, 396 (8th Cir. 1991). Wintermute contends Schott would have testified about the OCC's procedures to prevent and cure dishonest conduct by bank officials, which testimony would have allowed the jury to better evaluate the government's witnesses' testimonies regarding the materiality of Wintermute's alleged omissions.

We review for an abuse of discretion a district court's decision on admitting expert testimony under Federal Rule of Evidence 702. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141-42 (1999); Bonner v. ISP Tech., Inc., 259 F.3d 924, 928 (8th Cir. 2001). A district court can abuse its discretion in three principal ways: "[1] when a relevant factor that should have been given significant weight is not considered; [2] when an irrelevant or improper factor is considered and given significant weight; and [3] when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment." Kern v. TXO Prod. Corp., 738 F.2d 968, 970 (8th Cir. 1984). We may affirm on any ground supported by the record, even if that ground was not a basis for the district court's ruling. Bilal v. Lockhart, 993 F.2d 643, 645 (8th Cir. 1993).

District courts occasionally have permitted defendants to present experts to rebut the government's evidence on the issue of materiality in section 1001 cases. See, e.g., United States v. McGuire, 79 F.3d 1396, 1404 (5th Cir. 1996), reh'g granted, vacated on other grounds, 90 F.3d 107 (5th Cir. 1996); United States v. Lueben, 812 F.2d 179, 182-86 (5th Cir. 1987), vacated in part on other grounds, 816 F.2d 1032 (5th Cir. 1987); United States v. Oneida Research Servs., Inc., No. 97-CR-373 (RSP), 1998 WL 59453, at *3 (N.D.N.Y. Feb. 9, 1998). Assuming they are qualified to testify, however, such experts must still pass muster under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589-93 (1993), and Federal Rule of Evidence

702,[1] by convincing the district court the evidence they plan to present is "reliable" and "relevant" such that it "will assist the trier of fact to understand the evidence or to determine a fact in issue." See Unrein v. Timesavers, Inc., 394 F.3d 1008, 1011 (8th Cir. 2005) ("There is no single requirement for admissibility as long as the proffer indicates that the expert evidence is reliable and relevant.").

Wintermute submitted a certification from Schott in support of her motion to permit his testimony setting forth Schott's qualifications and proposed testimony. With respect to materiality, Schott proposed he would testify the OCC's failure to take certain actions after learning the facts behind Wintermute's and Sinclair's false statements made in the IBF Report "indicates that the alleged misrepresentations were not material and would not have affected the decision-making process with respect to the change in control application."[2]

---

[1]Rule 702 provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

[2]The relevant portions of Schott's certification regarding materiality include:
19. Given the above facts, I am of the opinion that none of the alleged misrepresentations which form the basis of Count Two of the indictment were capable of influencing the OCC's decision-making process with respect to the Bank's change in control application.
20. Here, it is clear that the OCC raised certain issues and received certain responses, with which it was satisfied. If it had been dissatisfied with the responses, the OCC would have taken one or more of several different actions: (a) the OCC certainly would have confronted Susan with the alleged misrepresentations and given her an opportunity to respond; and (b) if the OCC had been dissatisfied with the responses, the OCC would have taken one or more of several different actions, such as bringing a notice of charges, seeking civil monetary penalties, filing a temporary cease and desist proceeding, filing a cease and desist proceeding, and seeking suspension and/or removal of Susan as a

Assuming arguendo Schott was qualified to testify as an expert, his proposed testimony presents an erroneous understanding of section 1001's materiality element. As previously stated, to prove materiality, the government needed to show only the false statements were *capable* of influencing the OCC's decision. The government was not required to prove the false statements actually *succeeded* in influencing the OCC, or influenced that decision within any specific period of time. See United States v. Pizano, 421 F.3d 707, 722 (8th Cir. 2005) ("The materiality inquiry focuses on whether the false statement had a natural tendency to influence or was capable of influencing the [agency]." (quoting United States v. Rashid, 383 F.3d 769, 778 (8th Cir. 2004), cert. denied, 125 S. Ct. 941 (2005), cert. granted and judgment vacated on other grounds, Abu Nahia v. United States, 126 S. Ct. 300 (2005))).

Schott's proffered testimony misrepresented the government's burden of proving materiality, and by misconstruing the legal question at issue, the testimony was not relevant. If offered, the expert testimony would have served to confuse rather than assist the jury in the jury's attempt to understand the evidence on this issue. The district court properly assessed and weighed these relevant factors, and made a reasoned judgment to exclude Schott's testimony. The district court did not abuse its discretion.

---

director of the Bank.

. . . .

24. The fact that the OCC took no action after learning the facts more fully, by August 4, 2000, indicates that the alleged misrepresentations were not material and would not have affected the decision-making process with respect to the change in control application.

-10-

## B.    Tainted Jury Deliberations

After trial, Wintermute moved for an evidentiary hearing to determine whether the jury's deliberations were tainted by extraneous evidence of SFG investors' losses. To support her motion, Wintermute submitted two jurors' affidavits that stated during deliberations another juror asked "what kind of message will it send to the SFG investors if we do not convict?"  The district court denied the motion, holding the statements were not extraneous. Wintermute appeals, arguing the district court abused its discretion by declining to hold an evidentiary hearing to allow Wintermute to question the jurors.

The district court has broad discretion in managing juror misconduct allegations, and its decision whether to conduct an evidentiary hearing over such allegations will be affirmed absent an abuse of discretion.  United States v. Vig, 167 F.3d 443, 450 (8th Cir. 1999).  Federal Rule of Evidence 606(b) prohibits jurors from testifying about their deliberations, but permits jurors to testify to "extraneous information or improper influence in the jury room."[3]  Id. (citing United States v. Krall, 835 F.2d 711, 715-16 (8th Cir. 1987)).  Extraneous influence includes "publicity received and discussed in the jury room, matters considered by the jury but not admitted into evidence, and communications or other contact between jurors and

---

[3]Rule 606(b) provides:
Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.  Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

outside persons." <u>Vig</u>, 167 F.3d at 450 (quoting <u>United States v. Bassler</u>, 651 F.2d 600, 602 (8th Cir. 1981)).

We agree with the district court the juror's alleged statement was not extraneous and thus did not warrant further investigation. The juror's statement regarded SFG investors' losses. Such a statement cannot be considered extraneous given the extensive references at trial regarding SFG's financing and eventual bankruptcy. <u>Cf. United States v. Swinton</u>, 75 F.3d 374, 381-82 (8th Cir. 1996) (remanding to the district court to hold an evidentiary hearing where during jury deliberations a juror stated defendant had a criminal record, but where no evidence introduced at trial contained that information). These references included: (1) during voir dire, Wintermute's counsel asked the jury panel whether anyone "heard anything or read anything about . . . SFG or Sinclair Financial Group or Stevens Financial Group," or if anyone "heard anything about people losing money by investing with those organizations"; (2) Pope testified SFG raised capital of $60-70 million from individual investors; (3) Stevens testified SFG funded itself by "raising debt through individual investors by the sale of time certificates and fixed rate investments"; (4) Wintermute testified she was one of the twenty largest unsecured creditors in SFG; and (5) Wintermute testified SFG declared bankruptcy. While no witness specifically testified investors lost money as a result of SFG's bankruptcy, the voir dire statements and trial testimony provide ample evidence from which a common sense inference could be made that SFG's actions caused investor losses.

Even if the juror's statement could be considered extraneous, Wintermute fails to "raise a colorable claim of outside influence," thereby raising the necessity of holding an evidentiary hearing. <u>United States v. Moses</u>, 15 F.3d 774, 778 (8th Cir. 1994) ("Not every allegation of outside influence requires an evidentiary hearing."). Wintermute theorizes the juror who allegedly made the statement *probably* accessed the Internet to discover these facts rather than learning the investment and bankruptcy information during the trial. To bolster this hypothesis, Wintermute's counsel submitted documents *he* found when *he* searched the Internet. It is patently obvious

Wintermute's counsel's Internet searches offer no proof the juror in question accessed the Internet or conducted independent research. Speculation and unsubstantiated allegations do not present a colorable claim of outside influence of a juror. See id. (citing United States v. Caldwell, 776 F.2d 989, 998 (11th Cir. 1985)). For this reason, and because the juror's alleged statement was not extraneous, the district court did not abuse its discretion in denying Wintermute's motion.

### C.    Sufficiency of Evidence

We now turn from arguments raised on appeal by Wintermute to those of her co-defendant Stevens. Stevens argues the district court erred in denying his motion for judgment of acquittal because there was insufficient evidence for a reasonable juror to conclude he was guilty of conspiracy to commit bank fraud. The government responds the evidence clearly demonstrates Stevens conspired with Sinclair to cause SNB to buy loans from Stevens, which secretly benefitted Sinclair and Wintermute.

"We review de novo the sufficiency of the evidence, examining the evidence in the light most favorable to the jury verdict and giving the verdict the benefit of all reasonable inferences." United States v. Blaylock, 421 F.3d 758, 772 (8th Cir. 2005), cert. denied, 126 S. Ct. 1108 (2006). The verdict will not be disturbed unless no reasonable construction of the evidence will support the jury's verdict. Id.

To convict Stevens of conspiracy, the government needed to prove Stevens (1) had an agreement to achieve an illegal purpose, (2) knew of the agreement, and (3) knowingly became part of the agreement. See Pizano, 421 F.3d at 719. The government need not have direct evidence of an explicit agreement–a "tacit understanding" among co-conspirators may be, and often will be, inferred from circumstantial evidence. See United States v. Rojas, 356 F.3d 876, 879 (8th Cir. 2004); United States v. Nambo-Barajas, 338 F.3d 956, 960-61 (8th Cir. 2003); United States v. Pintar, 630 F.2d 1270, 1275 (8th Cir. 1980).

Upon review of the evidence, "resolving all evidentiary conflicts in favor of the government," United States v. Gomez, 165 F.3d 650, 654 (8th Cir. 1999), we conclude there was sufficient evidence to convict Stevens of conspiracy to commit bank fraud. Evidence showed Sinclair and Stevens were very close and discussed all business transactions. As early as 1998, the two men discussed Sinclair acquiring a bank; Sinclair's conflict of interest by owning both a bank and a company doing business with the bank, which was against banking regulations; and the solution to Sinclair's conflict of interest being Stevens purchasing SFG. Further conspiracy evidence included: (1) Stevens's leveraged buyout of SFG–Stevens did not use any of his own money; rather, the sale was contingent upon Sinclair's bank acquisition "do[ing] the business plan they wanted to do" or the sale of SFG would be cancelled; (2) Stevens's testimony he was well aware a financing arrangement with the bank would provide SFG a more consistent amount of volume; (3) the advantages to Sinclair and Wintermute were apparent–Sinclair received "secret payments" through StFG of $43,500 per month and sold the manufactured home loans to SNB, and Wintermute received a $1 million loan to purchase a house funded by the sale of loans from StFG to SNB; (4) Stevens and Sinclair met with the OCC's McNeese before filing the Application for Change in Control, and Stevens testified "the whole idea" for meeting with the OCC before entering the deal was to make sure the OCC would accept the plan for SNB to do business with StFG; (5) McNeese asked Sinclair about companies he still owned, and neither Sinclair nor Stevens revealed Sinclair's ownership of SMS, the $5 million promissory note from StFG to Sinclair and Wintermute, Stevens's intention to sell Wintermute's loans to SNB, or StFG's correct $14.5 million sale price, which left McNeese with the impression the sale was for $9.5 million; (6) immediately after the OCC gave SNB change in control, SNB started purchasing a large volume of loans from StFG, with Stevens signing the loan agreements; (7) $300,000 of Wintermute's loans (held by StFG) were selected for sale to SNB without disclosure to SNB's board, which voted to approve the sale; (8) Pederson's testimony that Stevens directed him to select loans out of Wintermute's portfolio for sale to SNB; (9) check requests to Wintermute, signed by Stevens, for "Buyback of accounts to be purchased by [SNB]"; (10) sale of these loans from StFG

to SNB allowed Wintermute to purchase a house; and (11) loans from StFG to SNB funded Sinclair's $43,500 monthly "consulting" fee.

Based on the foregoing evidence, a reasonable juror could conclude Stevens had an agreement with Sinclair to defraud SNB and conceal the sale of Wintermute's loans to SNB, Stevens knew of the agreement, and he knowingly became part of the agreement. See Pizano, 421 F.3d at 719. We therefore affirm Stevens's conviction.

### D.     Alleged Sentencing Errors

Stevens alleges several sentencing errors. Stevens made numerous objections to the factual allegations contained in his Presentence Investigation Report (PSR) upon receiving the PSR. At sentencing, Stevens, through his attorney, attacked the PSR, stating "this Presentence Report is inaccurate across the board, and it shouldn't be that–what the court is being guided by in sentencing this individual." The government did not respond to Stevens's specific objections found in the PSR's addendum or his broad objection at sentencing. We review de novo the district court's construction and application of the Sentencing Guidelines, and we review for clear error its factual findings regarding enhancements. United States v. Jourdain, 433 F.3d 652, 658 (8th Cir. 2006).

Without any effort by the government to prove any of the challenged PSR factual statements, the district court summarily overruled Stevens's objections. The district court did not make any factual findings, conduct any 18 U.S.C. § 3553(a) analysis, or "state in open court the reasons for its imposition of the particular sentence." 18 U.S.C. § 3553(c). Presumably relying on the factual allegations and Guidelines calculations contained in the PSR, the district court sentenced Stevens to 60 months' imprisonment.[4]

---

[4]Pursuant to U.S.S.G. § 1B1.11(b)(1), the Guidelines manual effective November 1, 1998, was used to calculate Stevens's sentence. To support the imposition of Stevens's sentence, the district court had to find the amount of loss

-15-

"A sentencing court may accept the facts in a PSR as true unless the defendant objects to specific factual allegations." United States v. Sorrells, 432 F.3d 836, 838 (8th Cir. 2005). When the defendant so objects and the relevant responsive evidence has not already been produced at trial, "the government must present evidence at the sentencing hearing to prove the existence of the disputed facts." United States v. Poor Bear, 359 F.3d 1038, 1041 (8th Cir. 2004) (citation omitted). If the government fails in its burden and the district court sentences the defendant based on the allegations of uncharged conduct set forth in the PSR, which conduct increased the Guidelines base offense level, that sentence is in error, and we must vacate the sentence and remand for resentencing. Sorrells, 432 F.3d at 838.

In this case, the government did not present any evidence at sentencing proving the existence of the disputed facts regarding uncharged conduct, such as Stevens's challenged conduct resulting in the amount of loss sustained by SNB, the degree of Stevens's planning, whether Stevens substantially jeopardized the safety and soundness of the bank, and whether Stevens abused a position of public or private trust. While the relevant evidence may have been produced at trial–thus obviating the government's burden to produce responsive evidence at sentencing–based on the record before us, we are unable to determine whether the district court relied on trial evidence or on the PSR to sentence Stevens. We thus are unable to make a reasonableness review. See United States v. Rivera, 439 F.3d 446, 448 (8th Cir. 2006) (finding an inadequate record (1) to determine the district court's reasoning on Guidelines factors and non-Guidelines factors, and (2) "to conduct a meaningful

---

sustained by SNB, see U.S.S.G. § 2F1.1(b)(1)(N); the degree of Stevens's planning in conspiring to defraud the United States, see id. § 2F1.1(b)(2); whether Stevens substantially jeopardized the safety and soundness of a financial institution, see id. § 2F1.1(b)(7)(A); and whether Stevens abused a position of public or private trust, see id. § 3B1.3. These enhancements raised Stevens's base offense level from 6 to a total offense level of 27, which, based on Stevens's criminal history category I, resulted in a Guidelines range of 70 to 87 months. That range was limited by U.S.S.G. § 5G1.1(a) to a maximum statutory penalty of 5 years.

reasonableness review"). We must therefore vacate Stevens's sentence and remand to the district court for resentencing. Because of the general manner in which Stevens raised his factual objections at sentencing, the government may offer substantiating evidence on remand. See Sorrells, 432 F.3d at 838.

In remanding, we note in this post-Booker age, when sentencing a defendant, a district court "must first determine the appropriate guidelines sentencing range." United States v. Haack, 403 F.3d 997, 1002-03 (8th Cir.), cert. denied, 126 S. Ct. 276 (2005). "Once the guidelines sentence is determined, the court shall then consider all other factors set forth in § 3553(a) to determine whether to impose the sentence under the guidelines or a non-guidelines sentence." Id. at 1003. The district court shall then state, in open court, its reasoning for imposing the chosen sentence. See 18 U.S.C. § 3553(c). Finally, by remanding for resentencing we do not imply in any manner whether Stevens's sentence should be lower, higher, or the same.

## III.  CONCLUSION

For the reasons stated, we affirm Wintermute's and Stevens's convictions, but we vacate Stevens's sentence, and remand for resentencing.

_____