# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 07-2441

_____

United States of America,                    *
                                             *
          Plaintiff - Appellee,              *
                                             *
v.                                           *
                                             *
Emanuel Carlos Camacho,                      *
                                             *
          Defendant - Appellant.             *


_____

No. 07-2536

_____

Appeals from the United States
District Court for the
District of Nebraska.

United States of America,                    *
                                             *
          Plaintiff - Appellee,              *
                                             *
v.                                           *
                                             *
Randy A. Knaub,                              *
                                             *
          Defendant - Appellant.             *

No. 07-2538

_____

United States of America,            *
                                     *

      Plaintiff - Appellee,      *
                                     *

      v.                          *
                                     *

Jeffrey Leonard Romero,      *
                                     *

      Defendant - Appellant.    *

_____

Submitted: April 14, 2008
Filed: February 11, 2009

_____

Before LOKEN, Chief Judge, JOHN R. GIBSON, and MELLOY, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Emanuel Camacho, Randy Knaub, and Jeffrey Romero were jointly indicted on a single count each of conspiracy to distribute a controlled substance in violation of 21 U.S.C. § 846. Each was convicted; Camacho and Knaub for conspiracy to distribute marijuana and cocaine, and Romero for conspiracy to distribute marijuana. All three argue on appeal that the district court[1] erred by failing to find a violation of a sequestration order with respect to the government's two primary witnesses. Camacho and Knaub assert that the district court abused its discretion in allowing

_____

[1]The Honorable Warren K. Urbom, United States District Judge for the District of Nebraska.

-2-

those same witnesses' hearsay statements to be admitted as the testimony of co-conspirators. Camacho also argues that the district court erred in admitting certain expert testimony, in failing to investigate alleged juror misconduct, in refusing to grant his new trial motion, and in calculating his sentencing guideline range. We affirm.

Doug and Lindsey Yoder were the government's primary witnesses at trial, providing details about four trips they made from Greeley, Colorado to Lincoln, Nebraska to transport marijuana and cocaine. Doug had been selling marijuana in Greeley for a year and a half before March 2005, when the conspiracy in this case was formed. Doug's main supplier was Jeffrey Romero, from whom he obtained one to three pounds of marijuana every three to four days. In March 2005, Romero introduced Doug to Emanuel Camacho because Doug and Camacho both owned pit bulls and Romero knew they were interested in breeding their dogs. After they met, Camacho asked Doug if he wanted to sell opium that Camacho would front. Doug was interested and began offering opium to his regular marijuana customers. He became indebted to Camacho as he had more difficulty selling the opium, and Camacho proposed that Doug transport drugs to Camacho's father, Phillip Camacho, in Lincoln as a way of working off his debt. Doug met Phillip Camacho and they agreed that Phillip would pay Doug's expenses for the trips but nothing beyond that. Doug's compensation would be in the form of his debt to Camacho being reduced. Romero also met with them because he was going to supply the marijuana that Doug would be transporting. About three days after this meeting, Camacho called Doug to say that the first package would be ready soon.

On May 19, 2005, Doug obtained a rental car and went to Camacho's house to pick up the package, which was gift-wrapped. Doug, Lindsey, and her son then drove to Lincoln. After arriving at a Burger King in Lincoln to which Camacho had provided directions, Doug called Phillip who told him to find a motel. Doug found a motel and Phillip later met him there. From the motel, Doug followed Phillip to a

salvage business where they met Randy Knaub. Phillip and Doug retrieved the gift-wrapped package from the rental car and went inside. Knaub and Phillip opened the package in front of Doug. It contained marijuana, which they weighed. Although Doug did not see the weight on the scale or hear a number, he estimated that the marijuana weighed five pounds. Phillip expressed some concern about the quality but not the quantity of the marijuana, and Doug was then free to leave. Before Doug returned to Greeley, Phillip told him he should plan on making another trip within thirty days. Doug received $700 from Phillip for his rent in connection with this first trip, and Camacho deducted $200 from what Doug owed him and gave Doug $200 in expense money.

The Yoders' second trip to Lincoln was on June 4, and it followed the same pattern as the first trip beginning with Doug picking up a gift-wrapped package in Greeley from Camacho. When Phillip opened the package, he was unhappy with the quality of the marijuana it contained and he accused Doug of having switched packages. Doug urged Phillip to call his son to verify that the package was the original one that Camacho had marked with X's over the seams to reveal if it had been opened. After making the call, Phillip apologized to Doug and asked him to bring higher quality marijuana the next time. He then sold Doug an ounce of cocaine and told Doug that his partner Knaub, whom Doug had met on his first trip, wanted to talk to Doug about also supplying him with drugs. Doug told Phillip that he was not interested in dealing with Knaub. Before Doug left, Phillip gave him $850 to cover his rent and his expenses for the trip.

Doug made arrangements for a third trip with Romero, Camacho, and Phillip. Romero was to deliver ten pounds of marijuana, and Romero and Camacho told Doug he would also be taking a second package. Doug was to be involved in transferring money for the first time. On July 14, Doug and Lindsey left for Lincoln after picking up two gift-wrapped packages from Camacho. The following day they went to Knaub's business with Phillip. Knaub opened the packages which contained a total

-4-

of ten pounds of marijuana and a half kilo of cocaine.  Knaub weighed the cocaine, gave half to Phillip, and took the other half along with the marijuana to another room. Knaub handed Doug an envelope with money in it, which was what Romero had told Doug to expect.  Doug counted the money and found it was $100 short of the $3000 he had expected.  Knaub was unable to get any more money, and in response to Doug's concern that he would be blamed for the shortage, Phillip made a phone call and assured Doug that everything would be alright.  The Yoders returned to Greeley the following day and Doug delivered the money envelope to Romero.

About a week after his return, Doug had a conversation with Romero in which Romero urged him to stop his trips to Lincoln and said that he was no longer going to deal with Camacho or Phillip.  Doug had already decided that a fourth trip would be his last because by then he would have paid off his $800 debt to Camacho at the agreed-upon rate of $200 per trip.  Camacho called Doug on August 14 and Doug and Lindsey went  to his house and retrieved another gift-wrapped package.  They drove to Lincoln, arriving late, and Doug called Phillip from a motel the next morning. Phillip came to the motel and told Doug to arrange to have his room another night because Phillip had engaged a stripper and he wanted to spend some time with her. Doug went to the front desk to make the arrangements and to ask for more towels. When he returned to the room the stripper had arrived and Phillip had opened the package, which contained a half kilo of cocaine.  Phillip, the stripper, Doug, and Lindsey all used cocaine and Doug and Lindsey also smoked marijuana that they had brought.  About forty minutes after the partying started, a maid brought some towels to the room.  Some time later there was another knock on the door, and Doug answered it to find Lincoln police officers who said they were investigating the smell of narcotics.  The officers eventually entered the room and found the opened package. An officer asked Phillip's permission to look in it and, after seeing its contents, placed everyone in the room under arrest.

Doug was incarcerated for a few months, but Lindsey was released the following day. She went home to Greeley for a time and returned to Lincoln in early October 2005. Doug entered into plea agreements in December 2005 with state and federal prosecutors in which he pled guilty and was sentenced to five years' probation in state court for one count of delivery of cocaine. No federal charges were filed against him, but in return he was to cooperate with the investigation and testify if need be. Lindsey also entered into an agreement with federal prosecutors in which she agreed to cooperate with law enforcement in return for not being charged.

Camacho, Romero, and Knaub were jointly tried in December 2006, but that trial ended in a mistrial. A second jury trial ended with all three being convicted of one count of conspiracy to distribute narcotics. Camacho was sentenced to 121 months' incarceration, Knaub to 63 months, and Romero to 40 months.

I.

Doug and Lindsey Yoder's testimony comprised the bulk of the government's case in chief, with Doug being the first of the two to testify. Neither was present in the courtroom during the other's testimony. At the beginning of Lindsey's cross-examination by Romero's counsel, however, it became clear that she and Doug had discussed their testimony with each other and that she had refreshed his memory on some details. She admitted that the prosecutor had told her not to discuss her testimony with her husband and that she had knowingly ignored the admonition. All three defense counsel moved to strike the Yoders' testimony, and Camacho's counsel made an alternative motion for a mistrial. The relief they requested was for what they asserted to be a violation of the court's sequestration order entered at the beginning of the trial. The prosecutor expressed her belief that a violation had occurred as well, but she argued that neither witness's testimony had been affected by their conversations.

Although the parties referred to a sequestration order, the record reveals that the district court entered no such order. Before the jury was chosen, Knaub's counsel twice made what he referred to as a formal motion to sequester the trial witnesses. The court did not respond the first time, but the second time the district court granted the motion. The prosecutor asked that it be reciprocal, and the court agreed. Knaub's counsel asked for a possible exception in that he wanted his investigator to be present as his case agent even though that person may later testify. The court granted the exception and extended the same ruling to the government's case agent.

The colloquy between the lawyers and the district court shows that although the defense requested a sequestration order at the beginning of the trial, the parties intended only to gain the exclusion of witnesses from the courtroom while others were testifying. The district court pointed out the difference in its mid-trial ruling and stated that it had taken the defense request to be for an order of exclusion. The court noted that it had not specifically told any witness not to discuss his or her testimony with anyone else (except for telling Lindsey after the issue came to light), and placed the fault on itself and the lawyers for not being "explicit enough and insistent enough that each witness understand the necessity of not discussing the testimony." The court acknowledged the prosecutor's admonition to Doug and Lindsey but concluded that it was not tantamount to a directive from the court. Accordingly, the court refused to exclude their testimony, finding that neither had admitted to altering his or her testimony because of conversations with the other. The district court denied the motions.

We review a district court's rulings regarding sequestration orders for abuse of discretion, granting wide latitude to the court and requiring the moving party to show prejudice. United States v. Vallie, 284 F.3d 917, 921 (8th Cir. 2002); United States v. Sykes, 977 F.2d 1242, 1245 (8th Cir. 1992). The defendants argue that they were prejudiced because their ability to test the witnesses' veracity through cross-examination was compromised. However, they offer no record evidence to support

their allegation. After allowing questioning by defense counsel to probe whether the Yoders' testimony had been influenced by their conversations with each other, the district court noted that neither witness admitted to having "fashioned something so that the other would testify in a certain way. None has – has said that any specific thing which they talked about was of a nature that I could say is likely to have spurred the other to testify in a certain way." The court allowed defense counsel to continue cross-examining Lindsey about her conversations with Doug during the trial, thereby affording the jury the opportunity to further assess their credibility.

The district court did not abuse its discretion in its finding that the Yoders had not violated a sequestration order because such an order had not been entered. See United States v. Smith, 578 F.2d 1227, 1235 (8th Cir. 1978) (sequestration order extended only to excluding witnesses from courtroom and thus no violation occurred when a police officer took notes during trial and relayed the information to other officers waiting to testify on government's behalf). Accordingly, no error occurred in denying the motions to exclude their testimony or for mistrial.

II.

Camacho and Knaub argue that the district court erred in finding that a conspiracy had been established by a preponderance of the evidence such that co-conspirator statements were admissible, because the only evidence offered to establish a conspiracy was the compromised testimony of the Yoders. We will affirm the district court's ruling absent clear and prejudicial abuse of discretion. United States v. McCracken, 110 F.3d 535, 542 (8th Cir. 1997).

The district court conditionally admitted statements asserted by one or more witnesses to have been made by Camacho, Knaub, Romero, Phillip Camacho, and Doug and Lindsey Yoder pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence, which creates an exception to the hearsay rule for statements of co-

conspirators. At the conclusion of the government's case in chief, the district court made findings pursuant to United States v. Bell, 573 F.2d 1040 (8th Cir. 1978), that the government had proved by a preponderance of the evidence that: 1) each of the statements offered in evidence, asserted to have been made by one of the defendants and objected to as hearsay, was made by a member of the conspiracy; 2) the statements were made during the course of and in furtherance of the conspiracy; and 3) the statements were admissible as evidence against each of the defendants under Rule 801(d)(2)(E).

Neither Camacho nor Knaub specify which co-conspirator statements they contend should have been excluded. The district court made the appropriate Bell inquiry and we cannot say that its findings are erroneous, including the finding that the Yoders were co-conspirators. We have already rejected the argument that their testimony should have been stricken. Accordingly, the Yoders' statements that discussed the supply source for the marijuana and cocaine and identified the defendants' various roles in the conspiracy are properly considered statements made in furtherance of the conspiracy. United States v. Davis, 457 F.3d 817, 825 (8th Cir. 2006), cert. denied, 549 U.S. 1258 (2007). The district court's ruling was not an abuse of discretion.

### III.

Camacho, Knaub, and Romero each challenge the sufficiency of the government's evidence to sustain convictions against them. We review the sufficiency of the evidence de novo and will uphold the jury's verdict if substantial evidence supports it, considering the evidence in the light most favorable to the verdict and accepting all reasonable inferences as established. United States v. Cruz, 285 F.3d 692, 697 (8th Cir. 2002). The government must prove three elements to gain a conviction for conspiracy to distribute a controlled substance: 1) the existence of an agreement to achieve an illegal purpose; 2) the defendant's knowledge of the

agreement; and 3) the defendant's knowing participation in the agreement. <u>United States v. Smith</u>, 487 F.3d 618, 620 (8th Cir. 2007).

Camacho argues in general terms that the government failed to introduce evidence sufficient to link him to any criminal activity and he assails the Yoders' credibility. The record is replete with detailed testimony of each of the four trips the Yoders took to Lincoln to transport marijuana and cocaine supplied by Camacho in Greeley. The venture began as a way for Doug to pay off his drug debt to Camacho, and Camacho remained intimately involved in the conspiracy from beginning to end. The quantum of evidence was sufficient, and scrutinizing the credibility of witnesses is generally not grounds for reversal in a sufficiency challenge because it is the jury's job to assess credibility. <u>United States v. Bower</u>, 484 F.3d 1021, 1025-26 (8th Cir. 2007); <u>United States v. Barajas</u>, 474 F.3d 1023, 1026 (8th Cir. 2007).

Knaub also bases his sufficiency challenge in large part on the Yoders' credibility, and thus it too falls short. Knaub was one-half of the partnership that was on the receiving end of the Yoders' deliveries. He and Phillip were together when Doug made the first and third deliveries, and Knaub participated in opening the packages and weighing the marijuana and cocaine. During the second trip, Phillip told Doug that Knaub was interested in having Doug supply him directly with drugs, but Doug declined. Taken as a whole, the evidence was sufficient to establish that Knaub was part of the conspiracy.

Romero concedes that the government successfully proved the existence of the conspiracy and Romero's knowledge of it, but he challenges the sufficiency of the evidence that he was a participant.[2] Doug Yoder testified that Romero had been his

---

[2]Romero lists a number of instances in which Doug and Lindsey provided different accounts of various details of the deliveries in an effort to undermine the jury's findings. While we do not review credibility determinations on appeal, the differences in their testimony works against the defendants' argument in Section I,

-10-

main supplier of marijuana, providing him with one to three pounds every three or four days. Romero introduced Doug to Camacho, and when Camacho asked Doug to begin trafficking marijuana to his father in Lincoln, Doug contacted Romero to alert him that he would be needing greater quantities of marijuana. According to Doug, Romero was the source of the marijuana for his first and third trips to Lincoln, with the third trip being a delivery of ten pounds. In addition, Romero gave Doug directions about payment for the drugs and gave Doug $700 in rent money before the fourth trip where Doug was supposed to call Romero once he arrived in Lincoln. We conclude that substantial evidence exists to support the jury's finding that Romero was a participant in the conspiracy.

IV.

Camacho alone raises four additional issues. First, he argues that the government should not have been allowed to introduce expert testimony from a chemist on the substances seized from the Yoders' hotel room during their last trip to Lincoln. He asserts that the government gave no notice of its intent to use an expert witness to testify to lab test conclusions under Federal Rule of Criminal Procedure 16(a)(1)(G), and alleges that the district court erred in refusing to grant him relief for the failure pursuant to Rule 16(d)(2). We review the district court's ruling concerning the admissibility of expert testimony for abuse of discretion. United States v. Ortega, 150 F.3d 937, 943 (8th Cir. 1998).

The objection to this testimony originally came from Knaub's counsel, who conceded that the government had provided a proposed stipulation as to the expert's testimony and copies of lab results before the first trial some three months earlier. His objection was based only on the lack of notice, and Camacho's counsel did not object

---

supra, that the couple's conversations during trial allowed them to coordinate their testimony.

on any additional ground. "A defendant asserting reversible error under Rule 16(a)(1)(G) must demonstrate prejudice resulting from the district court's decision to admit the contested testimony." United States v. Kenyon, 481 F.3d 1054, 1062 (8th Cir. 2007). Camacho neither demonstrated nor alleged prejudice, and concomitantly the district court did not abuse its discretion in admitting the chemist's expert testimony.

Camacho next argues that the district court erred in refusing to investigate alleged juror misconduct in the form of sharing notes and discussing the evidence during a recess in the trial. On the third morning of trial, Knaub's counsel announced that he had received a report that a juror showed his or her notes to another juror during the previous afternoon's proceedings and that one juror was overheard discussing the evidence with another juror during a break. Camacho's counsel asked that the person who made these observations be required to identify the jurors involved so that they could be questioned to learn if egregious conduct had occurred. The district court noted that it had instructed the jurors not to talk to each other and, because there was no indication that egregious conduct had occurred, proposed to handle the situation by reminding them again. Camacho instead moved for a mistrial, which the district court denied. When the jurors entered the courtroom, the district court read again the portion of its instructions that directed them not to talk about the case with anyone, including each other, until the case had been submitted.

We will affirm a district court's decision whether to conduct an evidentiary hearing over allegations of juror misconduct absent an abuse of discretion. United States v. Wintermute, 443 F.3d 993, 1002 (8th Cir. 2006). "Speculation and unsubstantiated allegations do not present a colorable claim of outside influence of a juror," id. at 1003, and absent such a claim no hearing is required, see id. at 1002. Camacho raises no colorable claim of impropriety and no abuse of discretion occurred.

Third, Camacho asserts that the district court should have granted his new trial motion pursuant to Rule 33 of the Federal Rules of Criminal Procedure because Doug and Lindsey Yoder were not credible witnesses. Rule 33 allows a new trial "if the interest of justice so requires," and Camacho alleges that permitting incredible witnesses to testify was a miscarriage of justice. His argument can be restated as saying that there was a lack of credible evidence, and a new trial motion based on insufficiency of the evidence is to be granted only if the weight of the evidence is heavy enough in favor of acquittal that a guilty verdict may have been a miscarriage of justice. United States v. Lacey, 219 F.3d 779, 783 (8th Cir. 2000). New trial motions based on the weight of the evidence are generally disfavored, United States v. Campos, 306 F.3d 577, 579 (8th Cir. 2002), but the district court is permitted to weigh the evidence and evaluate the witnesses' credibility in its ruling. Lacey, 219 F.3d at 783-84. If it denies the motion we review for clear and manifest abuse of discretion. Id.

The district court reviewed the evidence including wire transfers of money, records of telephone calls between co-conspirators, evidence seized from the search of the motel room, and other documents and testimony. It also evaluated the Yoders' credibility and concluded that no miscarriage of justice had occurred. Our review reveals no abuse of discretion.

Finally, Camacho argues that the district court erroneously calculated his sentencing guideline range and that the evidence does not support a finding that he was a manager or supervisor and thus subject to an enhancement under U.S.S.G. § 3B1.1. We review the district court's factual findings for clear error. United States v. Mashek, 406 F.3d 1012, 1017 (8th Cir. 2005). Camacho contends that the evidence was not sufficient to conclude by a preponderance that more than 100 kilograms of marijuana were attributable to him. The district court considered the testimony at trial to the effect that five pounds of marijuana were involved in each of the first two trips and ten pounds in the third trip. The cocaine that was weighed by law enforcement

-13-

was 445.99 grams. The district court recalled the accuracy of Doug's estimate of the quantity of cocaine in the third trip and fourth trips as compared to the actual weight of the drug from the fourth trip and concluded that the conversion called for by U.S.S.G. § 2D1.1 resulted in the equivalent of 187 kilograms of marijuana. Camacho provides no evidentiary basis for his alternative figure of 99 kilograms, and we conclude that the district court did not err.

Camacho asserts that he should not have received a three-level increase as a manager or supervisor because he was no more involved in the distribution of drugs than were the Yoders and because his father was the decision-maker. He concedes, however, that the terms manager and supervisor may be construed quite broadly under U.S.S.G. § 3B1.1. United States v. Erhart, 415 F.3d 965, 973 (8th Cir. 2005). The evidence shows that Camacho recruited Doug Yoder to make deliveries to his father in Lincoln, Doug picked up the drugs from Camacho, and Camacho gave him instructions for each trip. All of these are relevant factors, and we conclude that the district court did not abuse its discretion in finding that Camacho was a manager or supervisor.

## V.

We affirm the district court's judgments, including the challenged convictions of Camacho, Knaub, and Romero, and Camacho's sentence.

_____