# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-1007
_____

United States of America

*Plaintiff - Appellee*

v.

James Robert Dowty

*Defendant - Appellant*
_____

Appeal from United States District Court
for the District of South Dakota - Rapid City
_____

Submitted: February 14, 2020
Filed: July 6, 2020
_____

Before LOKEN, BENTON, and KELLY, Circuit Judges.
_____

KELLY, Circuit Judge.

A jury convicted James Dowty of second-degree murder and discharging a firearm during a crime of violence. These charges arose from a shooting on the Pine

Ridge Reservation in South Dakota. Dowty appeals several rulings from the district court.[1] Because we find no basis for reversal, we affirm.

## I. Background

The grand jury indicted Dowty on one count of second-degree murder in violation of 18 U.S.C. § 1111 and one count of discharging a firearm during the commission of a crime of violence under 18 U.S.C. § 924(c)(1)(A)(iii). The government alleged that, shortly after 3:00 a.m. on July 20, 2016, Dowty shot and killed 14-year-old T.C. while she was walking along a street with three friends: Donovan Youngman, age 19; A.R.C., age 17; and R.O., age 15.

Dowty proceeded to trial, where R.O. was the first to testify. She explained that, shortly after midnight on July 20, 2016, she drank alcohol with T.C., A.R.C., and Youngman. She and T.C. also smoked marijuana and consumed Robitussin. At around 3:00 a.m., the four friends began walking along a street in Pine Ridge. She told the jury, "It wasn't pitch black. You could see because of the street lights." As the group walked, R.O. observed someone walking ahead of them wearing red shoes, shorts, and a backpack. R.O. testified that Dowty often wore a backpack. The group made a turn by cutting through a parking lot, and the person ahead turned that direction as well.

R.O. identified James Dowty as the person walking in front of the group. She was "certain" it was him because she saw his face and because she and Dowty are related. As the friends walked, T.C. asked whether the person was Dowty's brother "Joe Joe," but R.O. explained it was James because Joe Joe is "smaller." R.O., however, did not clearly identify Dowty in the courtroom as the person she had seen

<hr/>

[1]The Honorable Jeffrey L. Viken, United States District Judge for the District of South Dakota.

that night. She instead testified that one of Dowty's older Facebook photos, admitted into evidence at trial, depicted the person she saw.

R.O. also testified that Youngman and A.R.C. skipped rocks in Dowty's direction but did not hit him. This caused Dowty to turn twice towards the group. As he turned the second time, he held a gun in his hands. He fired the gun, striking and ultimately killing T.C. R.O. again confirmed she was "certain" Dowty was the shooter because she recognized his face before he pulled the trigger.

Youngman's trial testimony was similar to R.O.'s. Before the gunshot, he noticed the shooter wore red, or red and white, shoes; a hat; a black hooded sweatshirt; and a backpack. Youngman recognized the person as Dowty because he had seen him in Pine Ridge. Youngman testified that A.R.C. threw a rock towards Dowty without hitting him. Dowty then turned around twice, the second time shooting T.C. Youngman explained that streetlights were illuminated at the time. He identified Dowty in the courtroom as the shooter.

On cross-examination, Youngman acknowledged that he initially told law enforcement he was not sure what the shooter was wearing and did not identify the shooter as Dowty, but rather referred to the shooter as simply "that guy." He also admitted that in September 2016, about two months after the shooting, he told officers that he did not see the shooter's face. He confirmed that he previously told officers the shooter looked like "a little kid" as he walked.

A.R.C. also testified at trial. He noticed the shooter's red shoes, black hooded sweatshirt, hat, backpack, and shorts. Before the shooting, as the friends cut through the parking lot and passed near the shooter, A.R.C. recognized him as Dowty. A.R.C. admitted he threw rocks near Dowty. He saw Dowty turn around twice, firing a gunshot the second time and hitting T.C. He identified Dowty in court as the person who shot T.C.

On cross-examination, A.R.C. agreed he had told responding officers that the shooter wore a white T-shirt, black hat, low-top Nike shoes, blue jean shorts and white ankle socks. He admitted he never told officers the shooter wore a black hoodie. He further agreed he told officers that he did not really know Dowty and had seen him just once before.

Trina Andrews and Michelle Alexander also testified. They were driving together near the area when T.C. was shot. A young man flagged them down, asked if they had a phone, and explained that his friend had been shot. Andrews called 911 and relayed the dispatcher's questions to the teenagers. When Andrews asked who the shooter was, R.O. responded, "It's Jimmy Dowty!" Alexander told the jury that the area was well lit by streetlights.

Two agents testified about their investigation. FBI Special Agent Matthew Thatcher said he found a pair of red Nike low-top shoes, two black backpacks, black denim shorts, a red and black ball cap, and a black ball cap in Dowty's bedroom. These were admitted into evidence. Bureau of Indian Affairs Special Agent Theodore Thayer testified about measurements taken at the scene. He explained officers found a shell casing approximately 226 feet from where T.C. was hit. Neither the bullet nor the gun was ever found.

The forensic pathologist who conducted T.C.'s autopsy, Dr. Donald Habbe, also testified. He observed a gunshot wound to T.C.'s abdomen consistent with being shot from 50 to 70 yards. The wound was caused by a 9 mm bullet, generally matching the shell casing from the scene.

The defense called Paul Michel, O.D., who testified about "the eye as a sensory organ" and factors affecting eyewitness identification. Considering lighting, distance, and movement in a hypothetical setting like where T.C. was shot, Dr. Michel opined that "identification to the exclusion of all other persons . . . couldn't happen." On

-4-

cross-examination, Dr. Michel acknowledged his opinion did not account for an eyewitness who had prior experience with the person they identified.

In rebuttal, the government called Oglala Sioux Tribe Police Officer Jesse Brewer, who responded to the scene of the shooting. He testified that overhead lights were illuminated where the crime occurred. The district court admitted footage from Brewer's body camera that captured the scene as he first arrived. Brewer said the recording was not enhanced and accurately showed the street as it was that night.

Trial concluded on May 5, 2017, with the jury convicting Dowty on both counts. Dowty subsequently filed a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29 and a motion for new trial under Rule 33(a). The district court denied both motions by written order. The court later sentenced Dowty to 360 months in prison and five years of supervised release.

## II. Discussion

Dowty raises four issues on appeal. We address each in turn.

## A.

Dowty first argues the district court erred by denying his Rule 33(a) motion for a new trial. The court concluded the weight of the evidence was not so strongly in favor of acquittal that the jury's verdicts may have been a miscarriage of justice. We will reverse the district court's Rule 33(a) ruling only if it is "a clear and manifest abuse of discretion." United States v. Amaya, 731 F.3d 761, 764 (8th Cir. 2013).

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). When considering a motion for a new trial, the district court may "weigh the evidence,

disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." Amaya, 731 F.3d at 764.

Despite the broad discretion district courts enjoy under Rule 33(a), there are "limits," and the courts "must exercise the Rule 33 authority sparingly and with caution." Id. (cleaned up). New-trial motions "based on the weight of the evidence are generally disfavored." United States v. Camacho, 555 F.3d 695, 705 (8th Cir. 2009). "A district court may grant a new trial for insufficiency of the evidence only if the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred." United States v. Delacruz, 865 F.3d 1000, 1006 (8th Cir. 2017). A court "should not grant a motion for a new trial simply because it would have reached a different verdict." United States v. Bertling, 510 F.3d 804, 808 (8th Cir. 2007).

Dowty argues the evidence against him was "not overwhelming." He maintains the government's case rested on the identification testimony of three witnesses who admittedly had been consuming alcohol and controlled substances on the night in question. Dowty faults the district court's Rule 33(a) analysis for not recognizing "differences" in the eyewitness accounts and "how their stories changed" over time. He also relies on his own expert's testimony that, under the circumstances, it would be impossible to identify the shooter "to the exclusion of all other persons." Dowty suggests the district court applied the wrong standard to decide his Rule 33(a) motion when it held that "the weight of the evidence" is not sufficiently in favor of acquittal such that the jury's verdict was "a miscarriage of justice."

The district court did not abuse its discretion. While Dowty believes the district court misapplied the law, the court expressly followed our precedent by weighing the evidence and assessing the credibility of the witnesses before deciding the evidence was not so strongly in favor of acquittal that the jury's verdicts may have been a miscarriage of justice. See Delacruz, 865 F.3d at 1006; Amaya, 731 F.3d at

764. Consistent with our case law, the court explained it would "not grant a motion for a new trial simply because it would have reached a different verdict." See Bertling, 510 F.3d at 808.

Dowty essentially challenges the weight of the government's identification evidence. As explained above, this type of claim is "generally disfavored." See Camacho, 555 F.3d at 705. Three witnesses testified that they saw Dowty shoot T.C. All said they recognized him from previous encounters. R.O. and Youngman both explained that they saw Dowty's face. Officer Brewer testified that the area where the teenagers saw Dowty was "highly illuminated." Trina Andrews and Michelle Alexander, who attempted to help T.C. at the scene, corroborated this testimony. When Andrews asked who shot T.C., R.O. shouted "It's Jimmy Dowty!" Even granting that the teenagers were under the influence of alcohol and controlled substances, their testimony was not without support.

The three teenagers also testified consistently in material ways. They provided consistent details about Dowty's appearance and actions, as well as other details, such as A.R.C.'s throwing rocks towards Dowty. Objective physical evidence supported their testimony. The shooter's items of clothing that the three witnesses described—black backpack, dark hats, and red and white shoes—were found in Dowty's bedroom. Moreover, Dowty was able to cross-examine the teenagers about any inconsistencies in their testimony and about whether their accounts had changed over time. While the government's case might not have been "overwhelming," we cannot say the district court's decision to deny a new trial was a clear and manifest abuse of discretion. See Amaya, 731 F.3d at 764; see also Delacruz, 865 F.3d at 1006 (affirming denial of Rule 33(a) motion where certain witnesses "were motivated by the potential for leniency, were memory-impaired from past drug use, and provided some inconsistent statements" because they "told a consistent narrative" of the defendant's conduct).

## B.

Dowty next argues the district court erred by allowing three of the government's witnesses to meet before trial. Prior to jury selection, the government asked that Youngman, A.R.C., and R.O. be allowed to meet because A.R.C. was "struggling emotionally" and wanted to see his friends. A.R.C. was in custody on unrelated charges. Dowty objected, but the district court permitted the teenagers to meet for ten minutes before trial. The court instructed Dowty's defense investigator, deputy marshals, and the government's witness coordinator to supervise the meeting and ensure the witnesses made "no suggestion of any kind, direct or indirect, about any matters connected to the case whatsoever." During the meeting, A.R.C. stated that law enforcement said T.C.'s death was his fault. At this, the supervisors ended the meeting. As everyone was leaving the room, Youngman told A.R.C., "Don't worry, we got this Bro."

We review "a district court's rulings regarding sequestration orders for abuse of discretion, granting wide latitude to the court and requiring the moving party to show prejudice." Camacho, 555 F.3d at 702. Dowty has not shown the district court abused its discretion by allowing the three witnesses to meet. Indeed, given that the brief meeting was supervised by the defense investigator, deputy marshals, and the government's witness coordinator, and the district court's order that the witnesses not directly or indirectly speak about the case, the court did not breach its "wide latitude" by allowing the meeting. See id.

Even if the district court abused its discretion, Dowty has not shown resulting prejudice. See id. He contends Youngman's statement to A.R.C., "Don't worry, we got this Bro," affected his substantial rights. The district court carefully considered this argument—which Dowty did not bring to its attention until after trial—and decided "it is entirely unclear what [e]ffect [Youngman's statement] had on any trial testimony. Defense counsel had a full opportunity to cross-examine A.R.C. and

Youngman on their alleged statements," but chose not to do so. This undermines Dowty's claim that the incident caused prejudice. Dowty speculates that Youngman's statement shows a covert agreement among the witnesses to testify against him at trial, but he offers nothing else to support this conclusion. Given these circumstances, Dowty has not demonstrated reversible error. See id.

## C.

Dowty also challenges the district court's final instructions to the jury. Dowty did not submit proposed jury instructions to the district court. At the pretrial conference, he made no objections to the court's proposed instructions, including those related to witness credibility. The court instructed the jury generally on the credibility of witnesses based on Eighth Circuit Model Criminal Instruction § 3.04. The court told the jury to consider, among other things, the witness's opportunity to "see or hear the things testified about," whether the witness said "something different at an earlier time," the witness's "drug or alcohol use," and the "extent to which the testimony is consistent with any evidence that you believe." See 8th Cir. Model Crim. Jury Instr. § 3.04 (2017) ("Credibility of Witnesses"). On appeal, Dowty argues the district court plainly erred by not giving a more specific instruction on eyewitness testimony. See 8th Cir. Model Crim. Jury Instr. § 4.08 (2017) ("Eyewitness Testimony").

The trial court "has wide discretion in formulating the jury instructions." United States v. Blazek, 431 F.3d 1104, 1109 (8th Cir. 2005). We review for plain error the failure to give an instruction not requested at trial. United States v. Larsen, 427 F.3d 1091, 1095 (8th Cir. 2005). To prevail, a defendant must show plain error that affected his substantial rights. United States v. Olano, 507 U.S. 725, 732 (1993). When the jury instructions, "taken as a whole, fairly and adequately submitted the issues to the jury," there is no plain error. United States v. Banks, 706 F.3d 901, 908 (8th Cir. 2013).

Dowty contends the general witness-credibility instruction did not adequately guide the jury's assessment of the eyewitness testimony. See 8th Cir. Model Crim. Jury Instr. § 3.04. He notes that Model Instruction § 4.08 provides additional factors for the jury to consider when specifically judging the credibility of eyewitnesses. These include the "length of time the witness had to observe the person," the "prevailing conditions at the time in terms of visibility or distance," whether the witness "had known or observed the person at earlier times," and whether the witness "made an identification that was inconsistent with the witness's identification at trial." See 8th Cir. Crim. Jury Instr. § 4.08. Model Instruction § 4.08 also cautions that the jury that it "must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant before you may find him guilty." See id.

Dowty relies on United States v. Mays, 822 F.2d 793 (8th Cir. 1987), to argue for reversal. In Mays, we said it is "reversible error for a trial court to refuse [a more] specific jury instruction where the government's case rests solely on questionable eyewitness identification." Mays, 822 F.2d at 798. But Mays is distinguishable in two ways. First, Dowty did not ask for a more specific instruction, so the district court did not "refuse" one. See id. Second, the government's case did not rest "solely on questionable eyewitness identification." See id. Dowty raised credibility concerns, but the three people present during the shooting identified the shooter by name as someone they recognized from previous encounters. First responders supported crucial portions of the eyewitness testimony, including that overhead lights were illuminated where T.C. was shot.

Moreover, there is no error where the district court's instructions "adequately pointed out the relevant considerations to be weighed in gauging eyewitness testimony." United States v. Grey Bear, 883 F.2d 1382, 1388 (8th Cir. 1989). While Model Instruction § 4.08 gives the jury more specific guidance, Model Instruction § 3.04 addressed Dowty's concerns about the teenagers' opportunity to "see or hear the things testified about," whether they said "something different at an earlier time,"

their "drug or alcohol use," and the "extent to which the testimony is consistent with any evidence" the jury believed. See 8th Cir. Crim. Jury Instr. § 3.04. As a result, there was no plain error. See Grey Bear, 883 F.2d at 1388.

## D.

Lastly, Dowty contends the district court abused its discretion by denying his request for the jury to view the area where T.C. was shot. Dowty wanted the jury to go to the scene "at a time and under similar lighting conditions as existed at the time of the shooting at approximately 3:58 a.m. on the morning of July 20, 2016." The district court denied this request in part because it "could bring in information that is extraneous to any issue in the case."

The district court has inherent power to permit a jury to view places or objects outside the courtroom. United States v. Triplett, 195 F.3d 990, 999 (8th Cir. 1999). The court's decision "to allow or disallow a jury viewing of an alleged crime scene is highly discretionary." Id. A district court does not abuse its discretion by denying a viewing request when it would be "time-consuming and cumulative of photographic evidence and the testimony presented at trial." United States v. Scroggins, 648 F.3d 873, 875 (8th Cir. 2011) (cleaned up).

Dowty contends that, because the government's case relied on the credibility of the three eyewitnesses, the district court's decision to deny his viewing request impeded his ability to confront those witnesses under the Confrontation Clause. Dowty is wrong. The Sixth Amendment's Confrontation Clause "bars the admission of testimonial hearsay unless the declarant is unavailable and the defendant has had a prior opportunity for cross examination." United States v. Clifford, 791 F.3d 884, 887 (8th Cir. 2015) (citing Crawford v. Washington, 541 U.S. 36, 68 (2004)). Dowty does not identify any witness he was unable to cross examine. Indeed, he

-11-

acknowledges that he "vigorously" contested the eyewitnesses' identification testimony.

We cannot say that the district court abused its discretion by denying the viewing request. This would have required jurors to travel approximately 90 miles each way from Rapid City to Pine Ridge and to be present between 3 and 4 a.m. Moreover, there was no assurance the jury would have encountered a sufficiently similar scene, and the district court was concerned that such a viewing might also "bring in information that is extraneous to any issue" in the case. Because the court admitted testimony from numerous eyewitnesses—not limited to the three teenagers—about the conditions on the night of the shooting, as well as photographs and video depicting the scene, it decided Dowty's request would be "time-consuming and cumulative of photographic evidence and the testimony presented at trial." See Scroggins, 648 F.3d at 875 (cleaned up). There was no abuse of discretion.

We affirm the district court's judgment.

_____